# EXHIBIT "D"

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 3

### INDEX

| WITNESS | PAGE |
|---|---|
| ARNOLD G. RICHARDSON | |
| Direct Examination by Ms. Hammett | 5 |
| Cross-Examination by Mr. Sparrow | 20 |
| Cross-Examination by Mr. Garrett | 27 |
| Cross-Examination by Mr. Hunter | 34 |
| Redirect Examination by Ms. Hammett | 37 |
| Recross Examination by Mr. Sparrow | 40 |
| Further Redirect Examination by Ms. Hammett | 42 |

### INDEX OF EXHIBITS
(Exhibits attached hereto.)

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Typed statement of Mr. Richardson | 39 |

CERTIFICATE OF OATH  43
REPORTER'S DEPOSITION CERTIFICATE  44

---

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION
CIVIL ACTION FILE NO. 2:05CV527-F

GERALD RUHNOW and
CONNIE RUHNOW,

   Plaintiffs,

vs.

LANE HEARD TRUCKING, LLC, et al,

   Defendants
_____/

DEPOSITION OF:   ARNOLD G. RICHARDSON

TAKEN AT THE INSTANCE:   Defendant Lane Heard Trucking

DATE:   Thursday, April 13, 2006

TIME:   Commenced at 11:06 a.m.
   Concluded at 11:52 a.m.

LOCATION:   225 North Broad Street
   Thomasville, Georgia

REPORTED BY:   LORI DEZELL
   Registered Professional Reporter
   Georgia Certified Court Reporter

VIDEOTAPED BY:   BARBARA GRAVES

---

Page 2

APPEARANCES:
   REPRESENTING PLAINTIFF RUHNOW:
   J. CALLEN SPARROW, ESQUIRE (BY TELEPHONE)
   HENINGER GARRISON DAVIS, LLC
   2224 First Avenue North
   Birmingham, Alabama 35203
   205-326-3336

   REPRESENTING PLAINTIFF NORTHLAND INSURANCE:
   RANDOLPH GILLUM, ESQUIRE (BY TELEPHONE)
   ROGERS & ASSOCIATES
   3000 Riverchase Galleria, Suite 650
   Birmingham, Alabama 35244
   205-982-4558

   REPRESENTING DEFENDANT LANE HEARD TRUCKING:
   KATIE L. HAMMETT, ESQUIRE
   HAND ARENDALL, L.L.C.
   107 Saint Francis Street, Suite 2600
   Mobile, Alabama 36602
   251-432-5511

   REPRESENTING DEFENDANT CHRISTY CHAMPION:
   RICHARD BRETT GARRETT, ESQUIRE (BY TELEPHONE)
   RUSHTON, STAKELY, JOHNSTON & GARRETT, P.A.
   184 Commerce Street
   Montgomery, Alabama 36104
   334-206-3100

   REPRESENTING DEFENDANT ADKINS:
   JEFFREY G. HUNTER, ESQUIRE (BY TELEPHONE)
   NIX, HOLTSFORD, GILLILAND, HIGGINS & HITSON
   4001 Carmichael Road, Suite 300
   Montgomery, Alabama 36106
   334-215-8585

---

Page 4

          STIPULATIONS

1      The following deposition of ARNOLD G. RICHARDSON
2  was taken on oral examination, pursuant to notice, for
3  purposes of discovery under the Georgia Civil Practice Act,
4  as well as for all lawful purposes under the laws of the
5  State of Georgia. All formalities are waived. All
6  objections are reserved until such time as the deposition
7  is used, except as to the form of the question and the
8  responsiveness of the answer.
9      Reading and signing by the witness are waived.
10                    * * *
11      THE VIDEOGRAPHER: We're on the record. This is
12  the videotaped deposition of Gene Richardson being
13  held at 225 North Broad Street, in Thomasville,
14  Georgia, on Thursday, April 13th, 2006. The time is
15  11:06 a.m.
16      We're here in the matter of Ruhnow versus Lane
17  Heard Trucking being heard in the United States
18  District Court for the Middle District of Alabama,
19  Northern Division, Case No. 205-CV-527-F.
20      My name is Barbara Graves; the court reporter is
21  Lori Dezell with Accurate Stenotype Reporters.
22      Counsel, please introduce yourselves and the
23  witness will be sworn.
24      MR. SPARROW: Callen Sparrow on behalf of the

---

1 (Pages 1 to 4)

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 5

1  plaintiff.
2      MR. HUNTER: Jeff Hunter on behalf of the
3  defendant, Michael Adkins.
4      MR. GARRETT: Brett Garrett on behalf of the
5  defendant, Christy Champion.
6      MR. GILLUM: Randolph Gillum on behalf of the
7  plaintiff, Northland Insurance.
8      MS. HAMMETT: And this is Katie Hammett on behalf
9  of Lane Heard Trucking, the defendant.
10 Thereupon,
11         ARNOLD G. RICHARDSON
12 was called as a witness, having been first duly sworn, was
13 examined and testified as follows:
14         DIRECT EXAMINATION
15 BY MS. HAMMETT:
16  Q  Hey, Mr. Richardson, I'm Katie Hammett again.
17 Can you state for the record your full name?
18  A  My full name is Arnold Gene Richardson. I go by
19 my middle name.
20  Q  And what's your date of birth?
21  A  February 14th, 1936.
22  Q  Valentine's Day.
23  A  Yeah.
24  Q  Your social security number?
25  A  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.

Page 6

1   Q  And what's your current address?
2   A  276-B, Timber Ridge Drive, Thomasville, Georgia,
3  31757.
4   Q  Are you currently employed?
5   A  I'm retired.
6   Q  Do you recall where you were the evening of
7  March 7th, 2005?
8   A  Yes, I do.
9   Q  And where were you?
10  A  I was just outside of Troy, Alabama, on
11 highway -- that's 321, isn't it?
12  Q  231.
13  A  231. Okay.
14  Q  Okay. And again, my name is Katie Hammett and I
15 represent the defendant in a lawsuit that's being brought,
16 and the defendant I represent is called Lane Heard
17 Trucking.
18     This suit is being brought by Connie and
19 Gerald Ruhnow, and Mr. Ruhnow was involved in an accident
20 that also involved one of our truck drivers, Mr. Duke. And
21 Mr. Ruhnow has sued my client, Lane Heard Trucking, and
22 also sued Michael Adkins and Christy Champion.
23     This trial is likely to take place in Montgomery,
24 Alabama. And we're here today in Thomasville, Georgia, and
25 we're videotaping this deposition so that we can present

Page 7

1  your testimony to the jury to help them understand exactly
2  what happened.
3   A  Okay.
4   Q  Do you understand that we're videotaping this for
5  presenting --
6   A  Yes.
7   Q  -- to the jury? Okay. And do you understand
8  that you're under oath?
9   A  Yes, I do.
10  Q  I'm going to ask you a few questions. They --
11 some of the attorneys that are appearing by telephone today
12 may also have a few questions to ask you. If you don't
13 understand something I'm asking, please let me know. I
14 don't always frame questions correctly.
15     Also, if you need to take a break at any point,
16 just let me know.
17  A  Okay.
18  Q  You stated on March 7, 2005 you were traveling on
19 Highway 231 in Troy, Alabama?
20  A  Right.
21  Q  And did you witness an accident --
22     MR. SPARROW: Are you-all there?
23     MS. HAMMETT: Can you hear us?
24     MR. SPARROW: I can now. I couldn't for a second
25 there.

Page 8

1      MS. HAMMETT: Okay. Well, we're here.
2      MR. GARRETT: I couldn't hear you either.
3      MS. HAMMETT: Can you identify yourselves when
4  you speak?
5      MR. GARRETT: Yeah. Brett Garrett. I couldn't
6  hear either.
7      MR. SPARROW: Callen Sparrow. There was about 10
8  seconds where I didn't hear anything.
9      MS. HAMMETT: Okay. I was just doing a little
10 introducing and asking him if he understood that we
11 were under oath, and he does. And I'm about to get
12 into the meat of it.
13 BY MS. HAMMETT:
14  Q  All right. Let's go back for just one second.
15 You stated earlier you were traveling on Highway 231 on
16 March 7th, 2005?
17  A  Right.
18  Q  Correct? And did you witness an accident?
19  A  Yes, I did.
20  Q  All right. Can you please describe for me, and
21 actually more importantly for the jury, exactly what you
22 observed. And if you can give me as much detail as
23 possible, that would be great.
24  A  Okay. I was traveling down the highway and it
25 was very, very dark. And what I was looking for I was

2 (Pages 5 to 8)

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 9

1  convinced we had passed. I decided to get into the left
2  lane and find the first place I could to turn around.
3       And right after I got into the left lane of the
4  highway, my wife said, "What's that?" And I glanced over
5  and I could see on the, on the road, and it was just about
6  the time I passed it before I could even see it, and it was
7  a motorcycle laying in the road.
8       And I told her, I said, "Well, that's a
9  motorcycle." I was proceeding about 55 miles an hour.
10      So I started slowing up. And we were discussing,
11 I said, "Maybe I need to get stopped so we can see if we
12 can help somebody get that off the road."
13      About that time I looked in the rear view mirror.
14 By this time I was -- I had just slowed up. I hadn't
15 really stopped. I saw the truck headlights coming in that
16 lane. And I told my wife, I says, "Look, he's not going to
17 see that motorcycle." And about that time he hit the
18 motorcycle. By this time I had slowed almost to a complete
19 stop and I was probably a quarter of a mile down the road.
20      And I watched in the rear view mirror as the
21 truck ran over the motorcycle, drug the motorcycle, and it
22 appeared he was out of control. The motorcycle was
23 showering a lot of sparks. And before he went very far, he
24 started going towards the other side of the road. The
25 motorcycle burst into flames. And within a second, the

Page 10

1  truck then burst into flames and went on across the road.
2       I was watching this in my rear view mirror. I
3  did not see the other truck that apparently he hit, as I
4  learned later. But I did see that when he got to the other
5  side of the road, then there was another explosion of
6  apparently the other truck and a huge ball of fire and
7  flames that looked like about 50 feet high. And that's
8  what I saw.
9    Q  So you -- do you remember if you were traveling
10 northbound or southbound on Highway 231?
11   A  I was heading south.
12   Q  Okay. Did you notice the truck behind you
13 before?
14   A  No, I didn't.
15   Q  Okay. But there was obviously a truck that came
16 upon this motorcycle after you and hit the motorcycle?
17      MR. GARRETT: Excuse me. I hate to interrupt.
18 This is Brett Garrett. I can't hear anything you-all
19 are asking.
20      MR. SPARROW: I missed that last question and
21 answer. This is Callen.
22      MR. GARRETT: I'm getting like a four-second
23 delay probably.
24      MR. HUNTER: And that's the same with me,
25 Jeff Hunter.

Page 11

1       MS. HAMMETT: All right. Can you hear me now?
2       MR. HUNTER: Yes.
3       MR. GARRETT: Yes.
4       MR. SPARROW: Yeah.
5       MS. HAMMETT: Let's go off the record for a
6  minute and see if we can figure this out.
7       THE VIDEOGRAPHER: Off the record.
8       (Off the record.)
9       THE VIDEOGRAPHER: Okay. We're back on the
10 record.
11 BY MS. HAMMETT:
12   Q  Okay, Mr. Richardson. You said you were
13 traveling northbound or southbound on Highway 231?
14   A  Southbound.
15   Q  And it -- do you recall what time of night this
16 was?
17   A  It was -- I don't know the exact time but it was
18 very dark. It was well after dark.
19   Q  And do you remember if there were overhead lights
20 on Highway 231?
21   A  There were none in the -- in this area.
22   Q  Okay.
23   A  Because it was very, very dark.
24   Q  Okay. And is it your testimony that you did not
25 see the motorcycle until you were passing it?

Page 12

1    A  That's correct. It was very dark and you could
2  not see it. The motorcycle apparently was a black or a
3  very dark color. And I only saw it when I was just close
4  enough that the lights kind of caught it. Probably 20,
5  30 feet at the most in front of me.
6    Q  And so were you in the right lane or the left
7  lane?
8    A  I was in the left lane at that point.
9    Q  And the motorcycle was lying in the right-hand
10 lane?
11   A  It was laying in the right-hand lane almost to
12 the center, almost to the center line.
13   Q  Do you know why the motorcycle was lying in the
14 road?
15   A  No, I don't. I didn't at the time. A policeman
16 told me later that he had had an accident, run into a car,
17 but I didn't see that at all.
18   Q  Did you observe anyone around the motorcycle?
19   A  As I passed, I caught in the corner of my eye, it
20 looked like two figures moving towards the side of the road
21 probably ten feet from the motorcycle. But it was just a
22 glimpse. And I think there were two figures there, but
23 that's as much as I could tell.
24   Q  So it was your testimony, I believe, and correct
25 me if I'm wrong, that you had just gotten into the

3 (Pages 9 to 12)

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 13

1 left-hand lane?
2  A  Correct.
3  Q  Prior to passing the motorcycle?
4  A  That's right.
5  Q  And why had you changed lanes?
6  A  Because I was getting ready to turn around. We
7 were looking for the Wal-Mart and we had obviously passed
8 it. And we decided we had gone too far and decided we had
9 passed it. So I got into the left lane so that I could
10 turn left the next place I could see.
11  Q  So you didn't get into the left-hand lane to
12 avoid the motorcycle?
13  A  No. I was in the left lane probably a half mile
14 or more before we got to that point, thank goodness.
15  Q  So once you passed the motorcycle, is it your
16 testimony that you observed then headlights coming from a
17 truck towards the motorcycle?
18  A  Not immediately, but I started slowing down and
19 was at -- and I mentioned to my wife that maybe we should
20 stop and see if we could help -- if -- get that motorcycle
21 out of the road because nobody can see it. And anybody in
22 the right lane would undoubtedly hit it.
23     And I was slowing down, just gradually slowing.
24 I didn't slow real quickly. So by the time I looked in the
25 rear view mirror and saw the truck, I -- as I say, I was

Page 14

1 probably close to a quarter of a mile down the road.
2  Q  Do you remember anything about the truck? Could
3 you see what color it was or anything like that?
4  A  No.
5  Q  Do you know how fast the truck was going?
6  A  I have no way to know or -- no, I don't.
7  Q  Can you -- and just -- we've kind of had some
8 interruptions. Can you tell me one more time about what
9 happened with the truck hitting the motorcycle. Just
10 describe that for me one more time.
11  A  Okay. I was look -- watching this in my rear
12 view mirror, and I could see the truck hit the motorcycle.
13 And the reason I know it did, the motorcycle started
14 spewing sparks because the truck was obviously dragging it.
15 And it drug it and the truck started towards the left side.
16 And within just a second or two, the motorcycle burst into
17 flames. And then within a second or so later, the truck
18 burst into flames. By this time it was about halfway over
19 towards the other side of the road.
20  Q  So you observed then the truck hit the motorcycle
21 and then started veering into southbound traffic?
22  A  Yes.
23     MR. SPARROW: Hello?
24     MS. HAMMETT: Is everyone there?
25     MR. SPARROW: Yeah. Callen -- this is Callen.

Page 15

1     MR. GILLUM: I mean, I'm -- this is Randolph.
2 I'm still here.
3     MR. HUNTER: This is Jeff. I'm still here.
4     MR. GARRETT: Brett is still here too.
5     MS. HAMMETT: Okay. We had a beep so I just
6 wanted to make sure.
7 BY MS. HAMMETT:
8  Q  So once you observed the truck begin going into
9 the southbound traffic -- is that correct, it crossed the
10 median and went into the lane that would be the southbound
11 traffic?
12  A  It looked like it went in kind of a large arc.
13 It looked to me like the truck was out of control. I doubt
14 if he had any control at all.
15  Q  And you observed that the motorcycle was
16 underneath the truck at that point?
17  A  Yes.
18  Q  And it was --
19  A  It was dragging it and it continued to drag it
20 because it kept showering sparks all the way across.
21  Q  And so then you observed a truck traveling
22 southbound on 231?
23  A  I did not see that truck. I was watching in the
24 rear view mirror concentrating on the truck that was
25 dragging the motorcycle. I was far enough down the road

Page 16

1 that I didn't see what he hit, which I learned later it was
2 another truck. But I did see that when he hit it, again
3 just watching in the rear view mirror, I saw a huge
4 explosion and plume of fire when he got over to the other
5 side of the road.
6  Q  Okay. And did you stop after you observed it?
7  A  Yes, I was totally stopped by the time he got to
8 the other side of the road.
9  Q  Okay. And did you give a statement to the police
10 that night?
11  A  The next morning.
12  Q  All right. So did you assist after this
13 accident?
14  A  No. I was going to turn around. My wife was
15 scared and she said that, "Please, let's get out of here."
16 And she was very worried that, you know, that -- in the
17 first place there was really nothing we could do. And so I
18 have a navigation system and I looked down and found a road
19 just ahead of where I was that I could see it went up and
20 around the accident. So I followed that road on to the
21 other side of the accident.
22  Q  So at the time that you left the scene, what was
23 the last thing you observed? There was fire?
24  A  Lots of fire.
25  Q  Okay. And did you see any people at that point?

4 (Pages 13 to 16)

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 17

1  A  No.
2  Q  So how did you come to make a statement to the
3  police then?
4  A  The next morning I saw the news item and it said
5  that a truck had hit another truck. And I told my wife --
6  there was no mention of the motorcycle, and surely there
7  were other witnesses that knew that the truck had hit the
8  motorcycle, which was in my opinion what caused the wreck.
9  And I felt like I needed to go let them know that I did at
10 least witness that much. And that's why I went to them and
11 gave the report.
12 Q  If -- if you had been traveling in the right lane
13 instead of the left lane, do you think you would have hit
14 the truck?
15 A  Absolutely. The motorcycle.
16 Q  I mean the motorcycle, yeah.
17 A  Oh, yeah. There's no way that you can see that
18 far enough ahead to stop.
19    MR. GARRETT: You-all, I'm sorry, I didn't hear
20 the last question at all. It was breaking up again.
21 Would you repeat that last question?
22    MR. SPARROW: I didn't hear the question either.
23    MS. HAMMETT: Can you all identify yourselves for
24 the court reporter?
25    MR. GARRETT: This is Brett Garrett. I did not

Page 18

1  hear maybe the last two. There was a real long pause
2  there where there was just static, and I heard you
3  break in with your response about halfway through. I
4  don't know what was said. I'm sorry.
5     MS. HAMMETT: That's okay. Why don't -- can --
6  let's just have the court reporter read it back and
7  then you can hear it.
8     (Requested portion read by reporter.)
9     MR. SPARROW: I also couldn't hear the question,
10 and I'm entering an objection to the question.
11    MS. HAMMETT: Are we under -- we're under usual
12 stipulations here, right, guys?
13    MR. SPARROW: We are, but I still need to object
14 and I never -- I didn't hear the question.
15    MS. HAMMETT: Yeah, I understand. I'm not trying
16 to -- you can have your objection. I just -- we
17 didn't say that in the beginning. I just wanted to
18 make it clear.
19    Okay. Does anybody else have questions for him?
20 I'm going to look over my notes really quick.
21    MR. GARRETT: Well, I didn't -- did we ever -- I
22 didn't hear anything read back. I don't know what was
23 the last -- this is Brett. I didn't hear the
24 questions read back by the court reporter nor his
25 answer. I'm sorry.

Page 19

1     MR. SPARROW: I'll shortcut it. Brett, the
2  question as I understood it was, if you had been in
3  the lane with the motorcycle, would you have been able
4  to avoid it. Is that correct, Katie?
5     MS. HAMMETT: Yes, that's correct.
6     MR. MANAUSA: And I objected, and the --
7  Mr. Richardson's answer was that he would not have
8  been able to avoid it or he would have hit it. Is
9  that accurate?
10    MS. HAMMETT: Yes, that was accurate. Does
11 anyone else need -- do you need to object to the form?
12    MR. GARRETT: Yeah, I'm going to have to just
13 because -- you know, just on the standard form of it.
14    MS. HAMMETT: And that was Brett?
15    MR. GARRETT: Yes, this is Brett Garrett. I'm
16 sorry.
17    MS. HAMMETT: Okay. Does anyone else have
18 questions for him?
19    MR. SPARROW: Yeah, a few.
20    MS. HAMMETT: Why don't you go ahead and let me
21 look over a couple of things while you do this. Who
22 is this?
23    MR. SPARROW: This is Callen.
24    MS. HAMMETT: Okay. Why don't you go ahead,
25 Callen.

Page 20

1     MR. SPARROW: All right.
2           CROSS-EXAMINATION
3  BY MR. SPARROW:
4  Q  Mr. Richardson, how are you doing?
5  A  Fine.
6  Q  Good. I have a few questions for you. As I
7  understood it, or understand your testimony, you testified
8  that you first saw the motorcycle when you were 20 to
9  30 feet from it; is that accurate?
10 A  Yes. At the most, yes.
11 Q  All right, sir. And at that time you were in the
12 left-hand lane?
13 A  That's correct.
14 Q  And had been in it for about, I think you said,
15 about a half a mile?
16 A  Yes, at least a half a mile.
17 Q  Were there any cars in front of you within sight?
18 A  No, there were not.
19 Q  As I understand it, the truck that struck the
20 motorcycle was in the right-land lane the entire time you
21 saw it in your rear view mirror?
22 A  Yes, it was, at the time it struck the
23 motorcycle.
24 Q  Prior to the impact between that truck and the
25 motorcycle, did you see any evasive move or action by the

5 (Pages 17 to 20)

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 21

1  truck driver which you -- which appeared to be his trying
2  to avoid the motorcycle?
3       MS. HAMMETT: I'm going to object to the form.
4  This is Katie.
5    Q  You can answer.
6       MS. HAMMETT: Yeah, you can answer.
7    A  No. Again, I was about a quarter of a mile or so
8  down the road and I couldn't tell that he did, except that
9  he did immediately start heading towards the left side of
10 the road. But I think in my opinion that it was at the
11 time or right after he hit the motorcycle.
12   Q  Right. You saw what appeared to be sparks and
13 then immediately he started heading left?
14   A  Yes.
15      MS. HAMMETT: Object to the form.
16   Q  Do you have any idea how fast he was going, a
17 judgment as to the speed of that truck?
18   A  No. I was far enough away that I have -- there's
19 just no way I could judge how fast he was going.
20   Q  Where were you -- you mentioned two figures. I'm
21 going to call them people. Where were they when you saw
22 them in your peripheral vision?
23   A  Probably ten feet from the motorcycle towards the
24 side of the road.
25   Q  Were they out of the highway, were they still in

Page 22

1  the travel portion of the highway?
2    A  It looked like they were right at the edge of it
3  heading towards the side of the road. Probably just barely
4  in the road or about this time at the edge of the road.
5    Q  All right. And since you've described it as two
6  figures in your peripheral vision, I assume you don't have
7  any greater detail as to who those people were or what they
8  were wearing, et cetera?
9    A  No, none whatsoever.
10   Q  Did you see a car right around there,
11 Mr. Richardson?
12   A  No, I didn't.
13   Q  Did you notice one in your rear view mirror?
14   A  No, sir, I didn't.
15   Q  As you looked in your rear view mirror, did
16 you -- were you able to see the people on the side of the
17 road?
18   A  No. I didn't look in the rear view mirror until
19 I was probably part of the distance down the road and then
20 glanced up and saw the lights coming. At this point I was
21 probably at -- a few hundred yards down the road.
22   Q  Had that motorcycle -- or had you recently been
23 passed by a motorcycle on 231 prior to this wreck?
24   A  No, I had not seen any motorcycle before that.
25   Q  As I understood your earlier testimony, there

Page 23

1  were no cars close to you, in front of you?
2    A  That's correct.
3    Q  Have you spoken at any time since this wreck with
4  anyone other than the police officer, investigating trooper
5  who was a witness to the wreck?
6    A  No, not that was a witness, no, I haven't.
7    Q  All right. Who have you talked to other than the
8  police officer about this wreck?
9       THE WITNESS: Was it your office, Katie?
10      MS. HAMMETT: Yeah. I've spoken with him.
11   A  Okay. Yeah. And she has spoken with me.
12   Q  Talked to any other lawyers?
13   A  There was a lawyer that called me and I -- and
14 took a recorded message and sent me an interpretation of
15 that and asked me to correct it or approve it and send it
16 back.
17   Q  All right. Are you familiar or -- on the night
18 of this wreck, were you familiar with this area of 231? Is
19 that a road that you travel often?
20   A  No, I had never been there -- well, I think I
21 have traveled through that area before, a time or two,
22 but -- in the last several years, but I was not familiar
23 with the road.
24   Q  And I know you testified that you had not
25 realized that another truck was involved in the northbound

Page 24

1  lane, correct?
2    A  That's correct.
3    Q  Because your attention was in your rear view
4  mirror at that point and you didn't see that truck
5  approach, right?
6    A  That's correct.
7    Q  As you approached what we now know was the area
8  where that motorcycle was, was there traffic coming towards
9  you in the northbound lane?
10   A  No. At that moment I saw no traffic over there.
11   Q  You were kind of by yourself out there at that
12 moment?
13   A  Yes.
14   Q  And didn't see a car?
15   A  No, sir, I didn't.
16   Q  All right. What -- Mr. Richardson, what
17 posture -- I'm not sure how to say this -- how was the
18 motorcycle lying in the road? Was it -- were the two
19 wheels towards the center line or was it perpendicular to
20 the center line or what?
21   A  As near as I could tell, I think the wheels were
22 toward the side of the road and I think it was probably at
23 an angle in the road. I don't think it was, you know,
24 directly towards the side. But it was just in the road and
25 looked like it was with the wheels more or less towards the

6 (Pages 21 to 24)

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

Page 25

1  right side of the road.
2  Q  And as I understand what you're telling me, if
3  you had taken the handlebars and stood it straight up
4  without changing the way it was laying on the ground, that
5  it would have been heading largely southbound but at a
6  little bit of an angle; is that fair?
7  A  That's correct, yes.
8  Q  Do you have any understanding, Mr. Richardson,
9  from any source as to how long that motorcycle had been on
10 the ground prior to this wreck?
11 A  No, I don't.
12    MR. SPARROW: Hello? Anybody there?
13    MS. HAMMETT: Yes. Who is that?
14    MR. GARRETT: I can't hear his answer either.
15 This is Brett.
16 A  Okay. No, I don't have any idea how long the
17 motorcycle was there. My judgment would be that it was not
18 long only based on the fact that I saw what appeared to be
19 two figures going away from it. But I have no other way of
20 judging it.
21    MS. HAMMETT: Did everyone hear that?
22    MR. SPARROW: Yes.
23    MR. GARRETT: Yes.
24 BY MR. SPARROW:
25 Q  Have you been back by this area since the wreck?

Page 26

1  A  The next day, but that's all.
2  Q  Since then?
3  A  No, I have not been back to that area since then.
4  Q  This is a fairly flat and fairly straight stretch
5  of 231, isn't it?
6    MS. HAMMETT: Object to the form.
7  A  Reasonably so. It kind of goes uphill when you
8  look north slightly, but it's mostly flat.
9  Q  How fast were you going, Mr. Richardson, when you
10 first saw that motorcycle 20 or 30 feet in front of you?
11 A  I was going approximately 55 miles an hour.
12 Q  And then you began to slow down very soon after
13 seeing it, right?
14 A  That's correct.
15 Q  And in your rear view mirror you saw the
16 headlights and you were approximately a quarter mile down
17 the road when all of this started, when the impact began?
18 A  That's correct.
19 Q  And about how fast were you going at that time?
20 A  I was almost completely stopped. And by the time
21 I witnessed it all, I was stopped. Before the truck got
22 finished going towards the left side of the road, I was
23 totally stopped.
24 Q  Do you have a judgment, Mr. Richardson, as to how
25 much time elapsed between when you passed the motorcycle

Page 27

1  and when it was struck by the truck?
2  A  Probably 20 to 30 seconds.
3  Q  All right. And as I understand it, because of
4  the lighting situation or just because of your attention
5  being on something else, you did not during that 20 to 30
6  seconds see where -- or the people were or what they were
7  doing at that time?
8  A  No, I didn't.
9    MR. SPARROW: I think that's all I have. Has
10 somebody else got questions?
11    MR. GARRETT: Yeah. This is Brett Garrett for
12 Christy Champion. I've got a few if nobody objects to
13 it.
14    MS. HAMMETT: No, go ahead.
15         CROSS-EXAMINATION
16 BY MR. GARRETT:
17 Q  Mr. Richardson, how are you doing? This is
18 Brett Garrett. I represent Christy Champion. I've got
19 just a few questions for you.
20 A  Okay.
21 Q  I understand you were traveling southbound on 231
22 and you stated your wife was with you. Was she in the
23 passenger seat?
24 A  Yes, she was.
25 Q  And you testified earlier that it was actually

Page 28

1  your wife who brought the -- brought your attention to the
2  motorcycle; is that correct?
3  A  We both saw it I think at the same time and she
4  just said, "What was that?" And I said, "Well, that's a
5  motorcycle in the road."
6  Q  Okay. So you both -- you both saw it
7  simultaneously?
8    MS. HAMMETT: Object to the form.
9  A  Pretty much so.
10 Q  I'm sorry?
11    MS. HAMMETT: I objected to the form. It's just
12 speculation.
13 Q  Okay. Well -- okay.
14    MS. HAMMETT: He doesn't know what his wife --
15    MR. GARRETT: -- if you could. I'm sorry, I
16 didn't hear that. Can you repeat that?
17    MS. HAMMETT: Can everyone hear? Is everyone --
18 can everyone hear? This is Katie.
19    MR. SPARROW: I can now, yes. You're going in
20 and out.
21    MS. HAMMETT: Okay. Can we read back the last
22 question?
23 BY MR. GARRETT:
24 Q  I'll just ask it again. My question was, did you
25 and your wife first see the motorcycle simultaneously or at

7 (Pages 25 to 28)

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

**Page 29**

1  the same time?
2     MS. HAMMETT: And I objected to the form. Go
3  ahead and answer.
4    A  And I said pretty much so.
5    Q  Okay. Do you have a judgment if your wife saw it
6  first or second?
7    A  No. My judgment is we both saw it about the same
8  time.
9    Q  Okay. So you couldn't tell me if you saw it
10 first or if she did?
11   A  Not for sure, no.
12   Q  Okay. Now, you testified earlier you said that
13 the -- that the -- you first noticed the motorcycle in
14 front of your vehicle at approximately, you said, 20 or
15 30 feet.
16   A  At the most.
17   Q  I understand that sometimes when you're dealing
18 with speeds and distances, it kind of -- perception
19 sometimes is skewed.
20    Let me put that in terms of yards. Thirty feet
21 is about 10 yards, and that may give you kind of a better
22 perception. Is your testimony the same, that you saw the
23 motorcycle 10 yards in front of your car?
24   A  My judgment is that it wasn't over 20 or 30 feet
25 in front of the car when I saw it.

**Page 30**

1    Q  Okay. So that's approximately ten yards?
2    A  I think 30 feet is a lot less than ten yards.
3    Q  Well, three feet is a yard, I think. You know,
4  so --
5    A  Oh, okay.
6    Q  It just helps -- perception is sometimes tricky
7  at night. You know, you're looking through your
8  headlights, you're moving quickly, and sometimes it will
9  help people kind of get a better grasp on it if you talk in
10 terms of yards on a football field. And I was just
11 wondering if that maybe changed your opinion on the
12 distance.
13   A  No, sir, it was about ten yards, I'd say, or
14 slightly less.
15   Q  Okay. And you said that you -- who did you call
16 the next morning to report what you had seen in this
17 accident?
18   A  I went by the local police department in Troy and
19 they directed me to go to the highway patrol in --
20    MS. HAMMETT: Dothan.
21    THE WITNESS: Where?
22    MS. HAMMETT: Was it in Dothan?
23    THE WITNESS: Dothan, right. In Dothan.
24 BY MR. GARRETT:
25   Q  So the people in Troy directed you to the highway

**Page 31**

1  patrol in Dothan?
2    A  That's correct.
3    Q  So you drove from Troy to Dothan?
4    A  That was when we were getting ready to come back
5  to Thomasville. So on the way I stopped by there, yes.
6    Q  Okay. And do you remember who you spoke with at
7  the highway patrol?
8    A  No, I don't. But the officer had me write out a
9  report, which I did. And I know he signed it but I didn't
10 get a copy of it.
11   Q  Okay. And did you -- you said later that you --
12 you said sometime you gave a recorded statement. When
13 would you have given the recorded statement?
14   A  It was sometime after the accident. Several
15 weeks. And it was -- I'm not sure which law office that
16 called me.
17   Q  So several weeks after the accident an officer
18 called you at home; is that correct?
19   A  Yes, that's correct. But I don't know that it
20 was an officer. It was a lawyer.
21   Q  So you've given a taped statement to an attorney?
22   A  Yes, sir.
23   Q  I'm sorry, I couldn't hear that. I apologize.
24 Would you repeat that?
25   A  Yes, that's correct.

**Page 32**

1    Q  Now, what -- what attorney did you give the taped
2  statement to?
3    A  I don't remember. I don't know. He sent me a
4  typed up interpretation -- his interpretation of our
5  conversation. And I made a few minor corrections and sent
6  it back to him in the envelope that he provided.
7     MR. GARRETT: Okay. Let me go off the record for
8  a second.
9     MS. HAMMETT: Hold on one second. Hold one.
10 Hold on.
11    THE VIDEOGRAPHER: Am I supposed to go off?
12    MS. HAMMETT: Yeah, go off.
13    MR. SPARROW: That may be me, guys.
14    MS. HAMMETT: Hold on one second. Callen --
15    THE VIDEOGRAPHER: Off the record.
16    (Off the record.)
17    THE VIDEOGRAPHER: We're back on the record.
18 BY MR. GARRETT:
19   Q  Mr. Richardson, when you were traveling down the
20 road, you testified earlier that you were about a quarter
21 of a mile away from the accident when it occurred; is that
22 correct?
23   A  That's correct.
24   Q  And that you witnessed this whole episode through
25 your rear view mirror?

8 (Pages 29 to 32)

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 33

1    A    That's correct.
2    Q    Now, when you say rear view mirror, were you
3    focussed on the central rear view mirror or was it the left
4    or right side mirrors?
5    A    Pretty much the center of the rear view mirror.
6    I adjusted my position so I could see it in the rear view
7    mirror.
8    Q    Okay. And at any time did you turnaround and
9    look at the accident?
10   A    After the truck came to a stop and the huge ball
11   of fire went up, I then turned around and looked at it.
12   Q    Okay. As you were traveling down the road while
13   you were looking in your rear view mirror, was your wife
14   turned around in her seat watching this thing happen?
15   A    I'm not even sure. I assume she probably was.
16   Q    And when -- at any time when you spoke with the
17   police, did they give you their opinion of the cause of the
18   accident that left the motorcycle in the road?
19   A    The officer I gave the report to told me that the
20   motorcycle had just had an accident, had run into the back
21   of a car. That's what he told me. That's as much as I
22   know.
23   Q    And do you know who -- what officer that would
24   have been?
25   A    No, I don't.

Page 34

1    Q    Give me one second and let me look over that.
2    That may be it.
3        MR. GARRETT: That's all I've got.
4        MR. HUNTER: All right. This is Jeff Hunter.
5            CROSS-EXAMINATION
6    BY MR. HUNTER:
7    Q    Mr. Richardson, I'm going to try to be very
8    brief. I think most of the questions that I was going to
9    ask you have already been asked of you.
10       Let me -- let me go back and ask you a few
11   things. Did you spend the night that night in Troy?
12   A    Yes, I did.
13   Q    Okay. All right. What was your purpose of being
14   in Troy that day?
15   A    Our good friend, his -- her brother-in-law was
16   having a funeral. He had died. And we went to the funeral
17   which was the night of the accident. And this accident
18   happened after the funeral, after we had left the funeral.
19   Q    Okay. And where were you headed to when you saw
20   the accident occur?
21   A    We were going to Wal-Mart.
22   Q    Okay. And I believe you testified you had passed
23   the Wal-Mart and were looking for a place to turn around;
24   is that right?
25   A    That's correct.

Page 35

1    Q    Okay. So when you -- when you saw that
2    motorcycle in the road, at that moment you had no idea why
3    the motorcycle was in the highway; is that right?
4    A    That is correct.
5    Q    You had not seen what is now known as the
6    accident between Michael Adkins and Ms. Champion; is that
7    right?
8    A    That's correct.
9    Q    Okay. And the next morning when you woke up and
10   heard the news reports about this accident, your
11   understanding was that no one at that point knew that the
12   motorcycle was involved; is that right?
13   A    It was not mentioned in the news report.
14   Therefore, I felt like I needed to come forward and make
15   sure they knew about it.
16   Q    Okay. And at that moment your opinion was that
17   that motorcycle was the cause of this accident; is that
18   right?
19   A    Yes, it is.
20   Q    And that was before you knew that that motorcycle
21   had been involved in a previous accident; is that correct?
22   A    That's correct.
23       MR. GARRETT: I object to the form of that
24   question.
25       MS. HAMMETT: Who was that that --

Page 36

1        MR. GARRETT: I apologize.
2        MS. HAMMETT: Who objected?
3        MR. GARRETT: Brett Garrett on behalf of
4    Christy Champion object to the form of that past --
5    that last question.
6        MS. HAMMETT: Okay. We can go on now.
7    BY MR. HUNTER:
8    Q    Mr. Richardson, did you stop your vehicle after
9    the accident?
10   A    Yes. By the time the accident was in progress, I
11   was almost completely stopped. By the time the truck got
12   to the left side of the road I was completely stopped.
13   Q    Okay. Did you get out of the vehicle and speak
14   to anyone at the scene?
15   A    No, I didn't.
16   Q    Okay. Do you remember how long you remained at
17   the scene of the accident?
18   A    I didn't. We found the route to get around it
19   almost immediately and went on.
20   Q    Okay. The two figures that you testified that
21   you saw off to the side of the road, did you ever see those
22   individuals after you passed through and had stopped your
23   vehicle?
24   A    No, I didn't.
25   Q    Okay. And you testified that before you saw the

9 (Pages 33 to 36)

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 37

1  motorcycle in the road, you had not been passed by a
2  motorcycle headed down Highway 231; is that right?
3      A   That's correct.
4      Q   Okay.
5          MR. HUNTER: Mr. Richardson, thank you. That's
6  all I have.
7          MS. HAMMETT: This is Katie. I'm going to do a
8  few clean-up questions.
9          MR. MANAUSA: I don't think I have anything else.
10         MS. HAMMETT: This is -- are you-all there? Can
11 you hear me? This is Katie.
12         MR. SPARROW: Yes.
13         MS. HAMMETT: Ok. I've got a few follow-up
14 questions.
15         MR. SPARROW: Okay.
16              REDIRECT EXAMINATION
17 BY MS. HAMMETT:
18     Q   Mr. Richardson, where in Troy, Alabama had you
19 gotten on Highway 231?
20     A   At the funeral home which was -- I'm not sure
21 where it is. I'm not that familiar with Troy, but it was
22 kind of in town.
23     Q   How far had you been traveling on Highway 231
24 before you approached the motorcycle?
25     A   I'm not sure how far. If you're familiar with it

Page 38

1  and you know where the Wal-Mart is, it looks to me when we
2  went back that we had passed the Wal-Mart approximately two
3  miles.
4      Q   You testified earlier that you gave a recorded
5  statement to someone, either an attorney or someone from an
6  attorney's office?
7      A   Yes.
8      Q   And -- and you said a couple of times that you
9  received something back that was his interpretation?
10     A   Right.
11     Q   Were those -- whatever it was that you received,
12 which we don't have in front of us today, were those your
13 words?
14     A   More or less, although he took some liberties
15 with them and I made some minor corrections.
16     Q   You also testified earlier that you gave a
17 statement to a state trooper after this happened; is that
18 correct?
19     A   Yes, uh-huh.
20     Q   I'm going to show you -- which we'll mark as
21 Exhibit 1, guys -- what says at the top, "Alabama
22 Department of Public Safety, Highway Patrol Division."
23         MS. HAMMETT: This is -- for everyone on the
24 phone, this is part -- this is what appears to be his
25 statement that is part of the traffic homicide

Page 39

1  investigation, is one of the pages.
2          I'm going to give -- we'll mark this as Exhibit 1.
3          (Exhibit No. 1 was marked for identification.)
4      A   Okay.
5  BY MS. HAMMETT:
6      Q   Does that look familiar to you? Have you ever
7  seen that before?
8      A   Yes, I wrote this.
9      Q   And that's your signature at the bottom?
10     A   Yes, it is.
11     Q   And do you see whose name that you gave this
12 statement to?
13     A   Trooper Kevin D. Cook.
14     Q   Does that refresh your recollection now as to who
15 you spoke with?
16     A   I'm sure that was him but --
17     Q   Okay. Can I ask you just to read over this and
18 see if this is still what you remember and if those were
19 your -- did you actually physically write that statement
20 yourself?
21     A   I physically wrote this myself.
22     Q   So that was your contemporaneous understanding of
23 what happened and how this accident occurred?
24     A   Yes.
25     Q   Okay. And if you want to take a minute and look

Page 40

1  at it, I just want to ask you if you still agree with your
2  statement.
3      A   (Examining document.)
4          MR. GARRETT: While he's reading that, I'm sorry,
5  he kind of blanked out on me again. This is Brett.
6          MS. HAMMETT: Sure.
7          MR. GARRETT: What was the -- who was the officer
8  on that?
9          MS. HAMMETT: Kevin Cook.
10         MR. GARRETT: Okay.
11 BY MS. HAMMETT:
12     Q   Do you still agree with every -- with your
13 statement you made to the trooper?
14     A   Yes, I do.
15         MS. HAMMETT: We'll mark that as Exhibit 1.
16         I think that's all I have, guys. Anybody have
17 anything else?
18         MR. SPARROW: Hold on one second. This is
19 Callen.
20         MS. HAMMETT: Okay.
21             RECROSS EXAMINATION
22 BY MR. SPARROW:
23     Q   Mr. Richardson --
24     A   Yes.
25     Q   -- in looking at your statement which has now

10 (Pages 37 to 40)

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 41

1  been made an exhibit to your deposition, it says you were
2  in the right-hand lane. You were in the left-hand lane
3  though really, weren't you?
4      A   Yes, that's correct. I -- I skipped over that
5  when I just reread it. But that is correct, that was -- I
6  put that down incorrectly.
7      Q   Okay. I mean, I understand that you earlier had
8  been in the right-hand lane but you testified you were in
9  the left-hand lane for about a half a mile before you got
10 to the motorcycle; right?
11     A   Yes, that's correct.
12     Q   And also -- and I don't want to beat a dead
13 horse -- but in this statement you say you saw it ten feet
14 before you got to it. We kind of walked around that and
15 you now -- you now feel like it was probably closer to 20
16 to 30 feet?
17     A   At the very most. I know it was very, very
18 quickly that I saw it and I was past it. And I know that
19 if I had been in the right lane, there is no way I could
20 have avoided hitting it at still pretty high speeds of
21 rate. I would not have been able --
22     Q   And finally -- and again, nobody -- I understand
23 you weren't out there with a tape measure -- but this
24 statement says the truck was about 100 yards behind you.
25 And we now have discussed on numerous occasions that you

Page 42

1  were a full quarter of a mile down the road before that
2  impact occurred, right?
3      A   Yes, that's correct.
4          MR. SPARROW: Okay. That's all. I just wanted
5  to make sure we were all on the same page. Thank you,
6  Mr. Richardson.
7          MS. HAMMETT: Anyone have anything else?
8          MR. GILLUM: No. This is Randolph Gillum. I
9  haven't got any questions.
10         MR. GARRETT: Brett Garrett doesn't have
11 anything.
12         MS. HAMMETT: Okay. This is Katie. I'm just
13 going to ask one more question.
14         FURTHER REDIRECT EXAMINATION
15 BY MS. HAMMETT:
16     Q   Mr. Richardson, is there anything else that's
17 pertinent that we haven't discussed or somebody hasn't
18 asked you that you feel like would help the jury understand
19 what happened?
20     A   I don't think so. It sounds to me like we've
21 covered it very well from what I have seen.
22         MS. HAMMETT: Okay, guys. Stay on the phone and
23 we'll go off the record.
24         THE VIDEOGRAPHER: Off the record.
25         (Deposition concluded.)

Page 43

1              CERTIFICATE OF OATH
2
3  STATE OF FLORIDA    )
4  COUNTY LEON         )
5
6
7
8
9
10         I, the undersigned authority, certify that said
11 designated witness personally appeared before me and was
12 duly sworn.
13
14         WITNESS my hand and official seal this 19th day
15 of April, 2006.
16
17
18
19
20         _____
21         LORI DEZELL, RPR, CCR
           1-800-934-9090
22         850-878-2221
23
24         Georgia Certification B-1013
25

Page 44

1          REPORTER'S DEPOSITION CERTIFICATE
2  STATE OF FLORIDA    )
3  COUNTY OF LEON      )
4          I, LORI DEZELL, Registered Professional Reporter,
5  certify that the foregoing proceedings were taken before me
6  at the time and place therein designated; that my shorthand
7  notes were thereafter translated under my supervision; and
8  the foregoing pages numbered 1 through 45 are a true and
9  correct record of the aforesaid proceedings.
10         I further certify that I am not a relative,
11 employee, attorney or counsel of any of the parties, nor am
12 I a relative or employee of any of the parties' attorney or
13 counsel connected with the action, nor am I financially
14 interested in the action.
15         DATED this 19th day of April, 2006.
16
17         _____
           LORI DEZELL, RPR, CCR
18         Notary Public
           1-800-934-9090
19         850-878-2221
20         Georgia Certification No. B-1013

11 (Pages 41 to 44)

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO