# TYLER EATON

**TYLER EATON MORGAN NICHOLS & PRITCHETT INC.**

1

```
1        IN THE UNITED STATES DISTRICT COURT

2        FOR THE MIDDLE DISTRICT OF ALABAMA

3              NORTHERN DIVISION

4

5    CIVIL ACTION NO. 2:05-CV-527-F

6

7    GERALD RUHNOW and CONNIE RUHNOW,

8              Plaintiff,

9    vs.

10   LANE HEARD TRUCKING, LLC, et al.,

11             Defendants.

12

13

14              DEPOSITION

15                 OF

16       CHRIS BLOOMBERG, P.E.

17         December 18, 2006

18

19   TAKEN BEFORE:

20             J. Ashley Young

21             Certified Shorthand Reporter,

22             Registered Professional

23             Reporter and Notary Public
```

COPY


EXHIBIT
D

One Federal Place  •  Suite ... nue North  •  Birmingham, Alabama 35203
(205) 252-9152  •  Toll-Fre... x (205) 252-0196  •  www.TylerEaton.com

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1          A.      Michael Dorohoff.  It's

2     D-o-r-o-h-o-f-f.

3          Q.      He works with you?

4          A.      Yes.

5          Q.      And what is his function when

6     y'all go to a scene -- this scene

7     together?

8          A.      Surveying work is typically a

9     two-man job, so he's assisting me in, you

10    know, whatever help I need.

11         Q.      All right.  And when you say

12    "surveying work," what do you mean?

13         A.      Taking surveying equipment and

14    surveying the layout of the roadway, any

15    roadway evidence, essentially whatever we

16    want to measure.

17         Q.      Okay.  And when you say

18    "surveying equipment," are you talking

19    about the tripod with the lens on it that

20    you can -- that kind of surveying

21    equipment?

22         A.      Yes.

23         Q.      All right.  And with that, can

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

```
1    you get distances?

2         A.    Yes.

3         Q.    Is that the main reason that

4    you have it and use it?

5         A.    The main reason is to document

6    the road and the available evidence.

7         Q.    I guess you can get elevations

8    too?

9         A.    Sure.

10        Q.    And did y'all use that

11   equipment out there?

12        A.    Yes.

13        Q.    Did you -- or were you able to

14   determine, at least in your opinion,

15   where the initial impact occurred between

16   Michael Duke's truck and the motorcycle?

17        A.    Yes.

18        Q.    Did you use your surveying

19   equipment to determine -- strike that.

20              Did you attempt to determine

21   at what point -- strike that too.

22              Did you use that equipment,

23   Mr. Bloomberg, to determine the distance
```

**TYLER EATON**
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

14

1    from what I will call the crest of the

2    hill back towards Montgomery, north of

3    the accident scene, to the point of

4    impact?

5        A.    I'm not sure how far back we

6    surveyed.  I'd have to look at the survey

7    data.  Typically we'd go a thousand feet

8    either direction so probably so.

9        Q.    Do we have the survey data?

10       A.    We've got a printout of it.  I

11   don't have the raw data.

12       Q.    Okay.  Can you look at that

13   and tell me how far back y'all surveyed?

14       A.    No.  I mean, this is more

15   showing the gouge marks, tire marks, and

16   area of impact.

17       Q.    All right.  On the day that

18   you were there, what was the weather

19   like?

20       A.    My recollection is it was

21   chilly in the morning when we were out

22   there.  I think it was -- it wasn't

23   raining.

One Federal Place  •  Suite 1020  •  1819 Fifth Avenue North  •  Birmingham, Alabama 35203
(205) 252-9152  •  Toll-Free (800) 458-6031  •  Fax (205) 252-0196  •  www.TylerEaton.com

**TYLER EATON**

TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

```
1        A.     That's what the Alabama code

2    is, as I understand it.

3        Q.     That's what's required under

4    the law?

5        A.     That's correct.

6        Q.     As an expert in this type of

7    case, can you tell us how far most

8    vehicles actually do illuminate as they

9    travel down the road?

10        A.     I mean, it varies based on

11    how -- you know, how your headlights

12    are --

13        Q.     And I'm talking about low

14    beams now, not high beams.

15        A.     Correct.  -- how they're

16    calibrated and adjusted.  I mean,

17    typically, you know, maybe 100, 150 feet,

18    somewhere in that range.

19        Q.     And the reason I ask is as I

20    drove down -- and I'm sure you're

21    familiar with the drive from Birmingham

22    to Mobile on I-65?

23        A.     I am.
```

**TE TYLER EATON**
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

24

1     Q.    Yes.

2     A.    Sure.

3     Q.    Okay.  And I know you can see

4   things that are more than a hundred feet

5   in front of your car, can't you?

6     A.    Such as?  Can you give me an

7   example?

8     Q.    Well, no.  I was going to ask

9   you if you could give me an example of

10   some things that you can see that are

11   actually outside of that hundred-foot

12   thing.  Is there just -- there may not be

13   anything.  If you can think of an

14   example --

15     A.    If you've got something that's

16   highly reflective, reflective tape,

17   something like that.  Beyond that, I

18   mean, the dark -- you know, a dark

19   object, you definitely have some limit on

20   what you can see and especially not

21   just -- you know, there's something there

22   but nor be able to make out what it is.

23     Q.    Okay.  What is your

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1  understanding, for purposes of your

2  testimony in this case, what the

3  visibility was the night of this wreck?

4       A.    I think it was dark, I think

5  there's documentation that it had been a

6  light rain.

7       Q.    Do you have an opinion as to

8  whether or not on the night of this wreck

9  a driver traveling in the area that

10  Mr. Duke was traveling could see a

11  reflective something more than a hundred

12  feet in front of his truck?

13       A.    The best I can do in this case

14  thus far is look at what's required and

15  what's typical of a vehicle, and that

16  would be 100 to 150 feet.

17       Q.    Could he see lights more than

18  a hundred feet in front of him?

19       A.    Sure.  Sure.

20       Q.    Why didn't he see the lights

21  on the car and the motorcycle in this

22  wreck?

23       A.    I don't know if they were on.

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1       Q.    If they were on, as an expert

2   in this type of thing and an accident

3   reconstructionist, in your opinion, could

4   he have seen more than a hundred feet

5   away from the impact if he was looking?

6           MR. RIIS:   Object to the form.

7   Why don't you distinguish "if they were

8   on" which "they" we're talking about.

9       Q.    (BY MR. SPARROW:)   The

10  motorcycle and the car.  Assume for

11  purposes of this question that the car

12  headlights are on.

13      A.    Off the roadway?

14      Q.    Off the roadway facing -- I

15  believe the testimony is essentially due

16  south, whatever -- parallel to the

17  highway, whatever direction that is, and

18  that the rear lights are on, that the red

19  globes may be broken, but the bulbs

20  themselves are on, and that both lights

21  are on the motorcycle.  Now, with that

22  assumption, in your opinion, could a

23  driver approaching the point of impact

# TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1  see these vehicles more than a hundred

2  feet away?

3      A.    If the lights were, you know,

4  pointing toward them or projecting in a

5  distance away, you know, it's possible he

6  could see those lights.

7      Q.    Are you aware of what the

8  state code requires from a visibility

9  standpoint how far back you have to --

10  strike that.

11          What does the code require

12  from a site distance standpoint for rear

13  taillights?  How far back are you

14  supposed to be able to see under the

15  code?

16      A.    I don't recall.

17      Q.    How far back, under the code,

18  are reflectors supposed to be visible on

19  either a motorcycle or a car?

20      A.    I don't recall.

21      Q.    Do you recall the testimony in

22  this case by Gene Richardson?  Do you

23  remember which witness he was?

# TLE TYLER EATON

### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    Mr. Bloomberg, as an expert in this kind

2    of thing, that the lights at Pinkard's

3    would illuminate the highway for some

4    distance beyond the actual parking lot of

5    the store?

6         A.    You know, some distance.  It

7    also would provide backlighting which in

8    some cases can inhibit what you can see.

9    But, you know, like I say, it is 200 feet

10   away.  I don't think, you know, those

11   lights can illuminate the road back

12   there.

13        Q.    And that was my next question.

14   It's probably too far away to actually

15   illuminate the road where all this took

16   place?

17        A.    Yes.

18        Q.    A lot of your opinion is -- as

19   far as I understand your opinion is you

20   start with the hundred feet that's

21   required by the statute, and then you

22   figure feet per second based on whatever

23   speed he was traveling, and then you

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    assign an assumed reaction time; correct?

2        A.      A perception and reaction

3    time, correct.

4        Q.      I may be wrong because I

5    haven't looked this up in a long time,

6    but my memory is that feet per second is

7    essentially 1.5 or 1.47, something like

8    that; is that right?

9        A.      1.466.

10       Q.      So if you're driving 50, just

11   to make it easy, you're traveling about

12   75 feet per second?

13       A.      Roughly.

14       Q.      All right.  And then as I

15   understand, I've always kind of heard the

16   rule of thumb for reaction time was three

17   quarters of a second.

18       A.      If you want to break it down,

19   perception might be three quarters of a

20   second, and reaction might be another

21   three quarters of a second.  Combined,

22   it's usually about a second and a half

23   for an anticipated-type situation.

# TYLER EATON

TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

34

1       Q.      So when I was looking at your
2   thing -- and I may be wrong -- I had
3   about a two-second lag there, is that
4   right, between feet per second and -- or
5   maybe let me just ask you.  Under those
6   circumstances, you got the hundred feet.
7   When do you -- what is your opinion,
8   Mr. Bloomberg, of when Mr. Duke should
9   have first seen what was going on in
10  front of him on the highway?
11      A.      I mean, the first time, I
12  would think, you know, in this scenario
13  would be 100 feet, maybe 150.
14      Q.      Okay.
15      A.      And that's, you know, an
16  unanticipated event, looking, trying to
17  figure out what this is in the road, if
18  it is something, if it's a dog or if it's
19  something that's more of a threat, this
20  kind of a thing.
21      Q.      So what's the reaction time
22  there?
23      A.      I mean, I'm using -- just in

# TE TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

35

1    these calculations, I'm using a second

2    and a half which is kind of for more of

3    an anticipated-type situation as opposed

4    to a motorcycle lying in the middle of

5    the road at night.  It would probably be

6    more in the order of two-plus seconds.

7    But essentially there's so little

8    distance available, I'm just, you know,

9    using the second and a half.

10         Q.    Plus a half second for the

11   brakes to kick in.  You said that a truck

12   like this has some kind of lag time?

13         A.    Correct.  But, I mean, as you

14   can see in the paragraph above that, I

15   mean, even forgetting about the brake --

16   you know, the air lag, I mean, it has

17   already exceeded 100 feet.  It's already

18   at 120 feet just for somewhat of a low

19   perception and reaction time.

20         Q.    In reaching your conclusions,

21   did you -- strike that.

22              In reaching your conclusions,

23   what assumptions did you make in regard

# TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    Mississippi code.  Could you point to me

2    the specific code section you're

3    referring to in the Alabama code in the

4    documents produced by your attorneys and

5    show me the code section you're referring

6    to that requires 100 feet -- light to

7    shine 100 feet?

8        A.    The printout that I have says

9    Section 32-5-242.

10       Q.    Okay.  You don't know whether

11   it's -- are you looking at the code

12   section?  Do you have it with you?

13       A.    I've got it just printed out

14   from the Internet.

15       Q.    Okay.  If you will, look at

16   it.  Is it -- are you referring to

17   (b)(2)?

18       A.    Yes.

19       Q.    3542, Subsection B-2?

20       A.    Correct.

21       Q.    Okay.  Where it says, "There

22   shall be a lowermost distribution of

23   light," do you see that, the first

```
1    section on -- first sentence on
2    paragraph 2?
3         A.    Yes.
4         Q.    -- "or composite beam so aimed
5    and of sufficient intensity to reveal
6    persons and vehicles at a distance of at
7    least 100 feet ahead," does that mean
8    your low beam should show 100 feet ahead?
9         A.    Yes.
10        Q.    Okay.  What about your high
11   beam?
12        A.    Your high beam is in the
13   section right above that saying 350 feet.
14        Q.    350 feet.  So the low beam is
15   to have 100 feet, the high beam should be
16   a minimum of 350 feet; correct?
17        A.    Correct.
18        Q.    Is the Mississippi law the
19   exact same distance?
20        A.    It appears to be, yes.
21        Q.    Okay.  Do you know whether
22   Mr. Duke had his low beam or high beam on
23   at the time of the accident?
```

# ⅢＥ TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

110

1      A.      It's my understanding low

2  beam.

3      Q.      Okay.  Where did you get that

4  information from?

5      A.      I believe his deposition.

6          MR. RIIS:  Who, Mr. Duke?

7      A.      I mean -- I'm sorry.  I

8  believe, just, you know, looking at

9  the -- you know, he's got vehicles all

10  around him.  I don't think he'd be

11  driving with his high beams on.  But I

12  don't think anybody has testified that he

13  is.

14      Q.      Do you know of any testimony

15  that's been admitted -- or testimony so

16  far that states whether Mr. Duke, the

17  driver of the Lane Heard Trucking case,

18  had his high beam or his low beam on?

19      A.      I would have to look back at

20  all the testimony about it.  I don't

21  believe there's anybody that said he was

22  driving with his high beams on.

23      Q.      Okay.  So your report is just

# TE TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

111

1    assuming for the purposes of your report

2    that his low beams were on; correct?

3         A.      That's correct.

4         Q.      Could you tell from your

5    inspection of the vehicle -- of

6    Mr. Duke's -- the Lane Heard truck after

7    the accident, was there any way to tell

8    whether the low beam or high beam was on

9    at the time of the accident?

10        A.      No.

11        Q.      If, in fact, the -- Mr. Duke's

12   high beams were on as opposed to his low

13   beams at the time of the accident, how

14   would that affect your calculations as to

15   what his visibility would have been?

16        A.      There would be more distance

17   available to him.

18        Q.      Do you know how much right

19   now?

20        A.      If you apply the minimum

21   requirement, it's 350 feet.

22        Q.      So the same calculations in

23   your report we could do ourselves; is

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

112

```
1    that right?  I'm looking on page 3 of

2    your report, how you did it.

3         A.    Right.  Can you repeat your

4    question?

5         Q.    Yeah.  If we used the 350 feet

6    as opposed to the hundred feet, we could

7    do the calculations ourselves using the

8    outline on page 3 at the bottom three

9    bullets or bottom four bullets in your

10   report on page 3?

11        A.    Sure.

12        Q.    Okay.  And did you testify

13   that the speed at which Mr. Dukes was

14   going from the crest of the hill to the

15   point of impact was not relevant in

16   determining your opinions?

17        A.    I don't believe I did.

18        Q.    Okay.  I got a little garbled

19   at that point.  Was the speed relevant in

20   your opinion?

21        A.    I mean, I used a speed of 55

22   miles an hour for the avoidance

23   calculations for him.  You know, I'm
```

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

113

1    assuming that he's going that fast based

2    on the testimony of the tractor trailer

3    that's following him.

4        Q.    Did you see any testimony in

5    the documents you've read that Mr. Duke

6    was traveling between 65 and 70 miles an

7    hour just before he ran over the

8    motorcycle?

9        A.    Not that I can recall, not

10   from anybody from as good a perspective

11   as somebody, you know, trailing

12   immediately behind.

13       Q.    If there were testimony that

14   he was traveling between 65 and 70 miles

15   per hour just before the impact, how

16   would that affect your calculations in

17   your report as to his avoidance time?

18       A.    He would cover, you know, more

19   feet per second, so he would be

20   traversing that hundred feet in a faster

21   period of time.

22       Q.    He would have less avoidance

23   time; correct?

# ⅢE TYLER EATON

### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

61

1    taken, I guess that's a possibility.  But

2    I think the situation is a complex one.

3         Q.    Yeah.  And I went on the

4    Internet and pulled up y'all's Web site

5    where you set out kind of what you've

6    told me that y'all do.  And one of the

7    things that you're often asked to

8    determine is nighttime visibility and

9    what, on your Web site, is referred to as

10   nighttime visibility analysis.  And that

11   is one of the things that y'all do;

12   right?

13        A.    Sometimes, yes.

14        Q.    And, of course, when I printed

15   it out, I cut off half the paragraph, so

16   I'm not going to make it an exhibit.  But

17   it does state that typically in a

18   nighttime visibility analysis, quote, we

19   perform a visibility study on a night

20   that duplicates the moon phase -- then I

21   cut off a word of two -- closed quote,

22   and then, quote, additionally, we would

23   consider the sun and moon timetables

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

62

1    corresponding to the time of the

2    accident.  Vehicles, pedestrians, or

3    other objects of the same type as those

4    involved in the accident are also used,

5    closed quote.

6              Now, y'all didn't do any of

7    that in this case to determine the

8    nighttime visibility; right?

9         A.    No.

10         Q.    And then, quote,

11    state-of-the-art quality video equipment

12    is often used to document and duplicate

13    what can be seen by the naked eye, closed

14    quote.  And y'all didn't do that either;

15    right?

16         A.    No, we did not perform a

17    nighttime test in this case.

18         Q.    Let me mark as Plaintiff's

19    10 -- I don't have a paper clip, but it's

20    two pages.

21              (Whereupon, Plaintiff's

22              Exhibit 10 was marked for

23              identification.)

**TYLER EATON**

TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1      Q.     (BY MS. HINSON AMBROSE:)  I'll

2   work it out with Buzzy, and then he'll

3   tell you.  How is that?

4      A.     Sounds great.

5      Q.     Would you explain to me what a

6   nighttime visibility analysis is?

7      A.     Essentially it's a good amount

8   of effort.  I mean, essentially, you have

9   to get the roadway blocked off, you know,

10  the same kind of vehicles out there, if

11  not the same vehicle, and try to match

12  moon phase, time after sunset, all these

13  kinds of things to try as best you can to

14  duplicate conditions, rain, which makes

15  it difficult.

16     Q.     And you did not do an analysis

17  like this in this case; correct?

18     A.     That's correct.

19     Q.     Can you tell me why?  If you

20  answered this, I'm sorry.  I didn't hear

21  it.

22     A.     You know, it's quite an

23  undertaking.  And trying to coordinate

**TYLER EATON**
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

119

1    all this and try to match a light rain

2    condition, you know, with ten people's

3    schedules and things like, it's much

4    easier to do if there's no rain, if

5    there's things that are a little more

6    controllable.

7        Q.    I'm going through my notes

8    again.  But do you agree that the

9    circumstances of this case with it being

10   raining likely it was too difficult to

11   reproduce the conditions so that you

12   could perform your nighttime visibility

13   analysis?

14       A.    It makes it very difficult.

15   I'm not saying it can't be done, but, I

16   mean, you'd have to pick out a day, get

17   everybody lined up, and then everybody

18   goes up there.  If it doesn't rain, you

19   can't do it.

20       Q.    I understand.  I'm not trying

21   to put words in your mouth.

22       A.    I'm trying to answer your

23   question.  I don't know what the next

# ⫶⫶ TYLER EATON
**TYLER EATON MORGAN NICHOLS & PRITCHETT INC.**

120

1    question is.

2        Q.    No.  You did.  It's fine.

3    Like I said, I wasn't trying to put words

4    in your mouth.  I was just trying to --

5    and you did answer my question.

6        A.    Okay.

7            MS. HINSON AMBROSE:  That's

8    all I have.  Thank you.

9            MR. WHITT:  I've got a couple

10   more.

11           MR. SPARROW:  I do too.

12           MR. WHITT:  Okay.  Go ahead.

13

14   REEXAMINATION BY MR. SPARROW:

15       Q.    I meant to ask you a minute

16   ago when you were digging around in

17   there, but will you pull just a couple of

18   pictures out of the Champion vehicle

19   since we've got the motorcycle in here

20   now?

21       A.    (Witness complies.)

22       Q.    Do you have one for the front?

23   And these were taken, I'm assuming, on