# EXHIBIT "B"

```
 1            IN THE UNITED STATES DISTRICT COURT
 2           FOR THE MIDDLE DISTRICT OF ALABAMA
 3                    NORTHERN DIVISION
 4
 5
 6
 7    GERALD RUHNOW and CONNIE    )
 8    RUHNOW,                     )
 9          Plaintiffs,           )
10    vs.                         )   CIVIL ACTION NO.:
11    LANE HEARD TRUCKING, LLC,   )   2:05 CV 527-F
12    et al.,                     )
13          Defendant.            )
14
15
16
17         The deposition of KEVIN COOK taken
18    pursuant to the Alabama Rules of Civil Procedure
19    before Tina L. Harrison, Court Reporter and Notary
20    Public, State at Large, at Court Reporting
21    Associates, Inc., 256 Honeysuckle Road, Suite 23,
22    Dothan, Alabama, on the 22nd day of January, 2007,
23    commencing at approximately 11:40 a.m.
```

**CONDENSED**

```
                                                    2
 1               APPEARANCES
 2
 3  FOR THE PLAINTIFFS:
 4  (Gerald Ruhnow and Connie Ruhnow)
 5      Mr. Callen J. Sparrow, Attorney at Law
 6      2224 1st Avenue North
 7      Birmingham, Alabama 35203
 8
 9
10  FOR THE PLAINTIFF/INTERVENOR:
11  (Northland Insurance Company)
12  (Present via speakerphone)
13      Mr. Randolph J. Gillum, Attorney at Law
14      Rogers & Associates
15      3000 Riverchase Galleria, Suite 650
16      Birmingham, Alabama 35244
17
18
19  FOR THE DEFENDANT:   (Lane Heard Trucking, LLC)
20      Ms. Katie L. Hammett, Attorney at Law
21      Hand Arendall, LLC
22      107 St. Francis Street, Suite 3000
23      Mobile, Alabama 36601
```

```
                                                    3
 1           APPEARANCES (Continued)
 2
 3  FOR THE DEFENDANT:   (Christy Leann Champion)
 4      Mr. Richard McConnell (Mac) Freeman, Jr.,
 5          Attorney at Law
 6      Rushton, Stakely, Johnston & Garrett, PC
 7      184 Commerce Street
 8      Montgomery, Alabama 36101
 9
10
11  FOR THE DEFENDANT:   (Michael Adkins)
12      Mr. Murry S. Whitt, Attorney at Law
13      Nix Holtsford Gilliland Higgins & Hitson, PC
14      4001 Carmichael Road
15      Montgomery, Alabama 36103-4128
```

```
                                                    4
 1               STIPULATION
 2
 3      IT IS STIPULATED by and between Counsel
 4  for the parties that this deposition be taken at
 5  this time by Tina L. Harrison, Court Reporter and
 6  Notary Public, State at Large, who is to act as
 7  commissioner without formal issuance of commission
 8  to her; that said deposition be taken down
 9  stenographically, transcribed and certified by the
10  commissioner.
11      Except for objections as to the form of
12  the questions, no objections need be made at the
13  time of the taking of the deposition by either
14  party, but objections may be interposed by either
15  party at the time the deposition is read into
16  evidence, which shall be ruled upon by the Court on
17  the trial of the cause upon the grounds of
18  objection, then and there assigned.
19      The reading and signing of the deposition
20  is waived.
```

```
                                                    5
 1                  I N D E X
 2
 3  EXAMINATION BY:                   PAGE NO.
 4  Ms. Hammett                        6 - 13
 5  Mr. Sparrow                       14 - 23
 6  Mr. Whitt                         23 - 31
 7  Mr. Freeman                       31 - 34
 8  Ms. Hammett                       34 - 37
 9  Mr. Sparrow                       37 - 39
10  Mr. Whitt                            39
11
12
13
14
15              E X H I B I T S
16
17  PLAINTIFF'S                       PAGE NO.
18   1   Photograph                      23
19   2   Photograph                      23
20
21  DEFENDANT'S
22   2   Traffic Homicide Investigation Report   10
23   3   Photographs                     34
```

10

A. That is correct.

Q. And how many vehicles were involved in that accident?

A. To my knowledge -- because the vehicles were already gone when I got there -- there were two.

Q. Were all the vehicles gone when you arrived, including the commercial --

A. No. The two commercial vehicles had been separated. The motorcycle and the car was gone. I stand corrected on the car. I'm sorry. The car was parked off on the side of the road, but the motorcycle itself was gone.

Q. Do you know where the motorcycle had been taken at that point?

A. I can't recall.

(Whereupon, Defendant's Exhibit 2 was marked for identification and same is attached hereto.)

Q. I'm going to show you what's marked as Defendant's Exhibit 2. Is this a true and correct

11

copy of the investigation report that you prepared?

A. Yes.

Q. And you have a copy in front of you? Is that what you're looking at?

A. Yes.

Q. Okay. Other than this report, do you have any other field notes, photos, videos, that type of information?

A. There is a video that WSFA channel 12 has. They were supposed to send me a copy, and they have yet to send me one. But other than that, no. Everything you see here is all I've got.

Q. Did you have any understanding of what was on that video?

A. Yes.

Q. And what was your understanding?

A. The understanding was I told them I didn't want to see any bodies or anything like that, just the scene itself.

Q. So you believe they may have videos of bodies and --

A. No. Not of the bodies.

Q. -- what occurred?

12

A. No. Not of the bodies. This is going to be of the scene of the two commercial vehicles. Yes.

Q. Okay. Does this report reflect your personal investigation of the accident that occurred on 231?

A. Yes.

Q. And based on your investigation, did you reach any conclusions about the cause of this accident?

A. Yes.

Q. And what were those conclusions?

A. That Vehicle 1, a 2001 Freightliner driven by Michael Duke, was on the wrong side of the road when he had a collision with Vehicle 2, driven by Mr. Gerald Ruhnow of Osco, Illinois.

Q. And do you have any understanding of why Mr. Duke was on the wrong side of the road?

A. Yes, I do.

Q. And why was that?

A. Because the previous accident -- the vehicle was still in the road when Mr. Duke ran over the motorcycle, lodging underneath the

13

18-wheeler, causing him to lose control of his vehicle and travel into the northbound lane of traffic, which was occupied by Mr. Ruhnow.

Q. Based on your investigation, did you come to any conclusion about whether or not Mr. Duke did anything wrong in this accident?

MR. SPARROW: Object to the form.
MR. GILLUM: Form.

Q. You can still answer it.

A. Could you repeat the question, please?

MS. HAMMETT: Can you read it back?

(Whereupon, the last question was read back by the court reporter.)

A. My investigation -- in my opinion, no, he didn't.

MS. HAMMETT: If y'all want to

**Page 14**

go -- I've got to think a minute. I've got a couple of follow-ups, but y'all can go ahead and go.

EXAMINATION

BY MR. SPARROW:

Q. Trooper, my name is Callen Sparrow. I just have a few questions for you. In looking at the report that y'all have been referring to, it appears to me -- you've got one section that's description of events, precrash. And just in reading that, Trooper, it appears that the information involving the earlier wreck between Ms. Champion and Mr. Adkins was obtained by your speaking with Trooper Helms; is that correct -- who had investigated that wreck; is that correct?

A. That's correct.

Q. Did you ever have, directly, any conversation with Ms. Champion or Mr. Adkins?

A. No, sir, I did not.

Q. Katie asked you this a minute ago, and I apologize. I just don't remember your answer. Other than what you have in your report here and

**Page 15**

the video that you mentioned from WSFA, are there any field notes or anything like that?

A. No, sir.

Q. Okay. Did you take any and they're just gone now, or did you just --

A. I took them but they're gone. Everything is right here. Yes, sir.

Q. Now, the actual wreck report, not what y'all have been talking about, but the three- or four-page typical wreck report, I understand you did; is that correct?

A. That's correct.

Q. It lists in the back -- on the back of one of the pages the witnesses that you spoke to were Mr. Gene Richardson and a Randall Jackson; is that correct?

A. That's correct.

Q. Now, Trooper Helms mentioned to us earlier, in the case of his investigation, if he had spoken with any other witnesses, he would have noted them somewhere. Is the same true for you?

A. Yes, sir.

Q. All right. So we can correctly assume

**Page 16**

that in addition to what you learned from Trooper Helms, you spoke with Randall Jackson and Gene Richardson?

A. I did not speak with Mr. Jackson. I tried to get in contact with Mr. Jackson. Trooper Helms gave me this name and said, Okay, this individual seen it. This is his address. This is his phone number.

Q. And were you ever able to do that?

A. I never was able to make contact with him.

Q. So you listed him as a witness because that information had been given to you?

A. That's correct.

Q. But you didn't talk to him?

A. No, sir.

Q. You tried but you just weren't able to --

A. -- make contact? Yes, sir.

Q. Now, it's my understanding from other depositions in this case, Trooper, including Mr. Richardson's deposition, that that night when this wreck happened, he actually just kept going.

**Page 17**

So I know you didn't talk to him that night; is that correct? Do you have a memory of that? Because he testified that he saw it on the news the next morning and then tracked somebody from the troopers down so that he could give whatever information he had.

MS. HAMMETT: Object to the form.

A. That is correct.

Q. Excuse me?

A. I talked to him several days later.

Q. And you're looking at something to refresh your memory?

A. Yes, sir.

Q. And what is that? Part of the homicide report?

A. Yes, sir. I'm looking at a statement that he actually wrote me.

Q. You didn't see this wreck; correct?

A. No, sir.

Q. And it appears that the information that you had that you -- that was used to compile your

**Page 18**

1 more lengthy report was information you got from
2 Trooper Helms involving the earlier wreck; correct?
3    A.   Yes.
4    Q.   And then some days later a conversation
5 with Gene Richardson, whose statement you just
6 found in your report; correct?
7    A.   Yes.
8    Q.   Any other witnesses, Trooper, that
9 you're aware of?
10    A.   No, sir.
11    Q.   As part of your reconstruction or
12 homicide report, did you feel it was necessary to
13 do whatever calculations were necessary in order to
14 determine independently what you felt the speeds of
15 these two trucks were?
16    A.   If there would have been -- the
17 commercial vehicles were destroyed. So there was
18 no way I could -- no way we were able to do a
19 linear momentum --
20    Q.   Right.
21    A.   -- or to calculate any speed because
22 they were totally destroyed.
23    Q.   I mean, you couldn't get crush profiles

**Page 19**

1 or anything of that nature?
2    A.   Could not get crush or anything like
3 that.
4    Q.   So the speed that you have or the speeds
5 that you assume for purposes of your report, as I
6 understand it, would have been from the testimony
7 of the witnesses that we just discussed a second
8 ago?
9    A.   Yes, sir.
10    Q.   Likewise, Trooper, because of the
11 condition of the two commercial vehicles, would it
12 have been possible for you to determine the
13 condition of any of the reflectors or lights as
14 they existed prior to the collision on either of
15 the two commercial vehicles?
16    A.   There was no way.
17    Q.   Just no way to do that?
18    A.   No, sir.
19    Q.   Once again, would have had to rely on
20 the testimony of the witnesses that we discussed
21 earlier?
22    A.   Yes, sir.
23    Q.   I meant to ask him earlier, but I think

**Page 20**

1 you may know the answer to this. Trooper Helms
2 mentioned that one of y'all's colleagues -- and I
3 don't remember who it was. It may have been Ken
4 Kelley. That name kind of rings a bell.
5    A.   Sergeant Kelley?
6    Q.   Maybe Sergeant Kelley. Someone came to
7 the scene for purposes of inspecting, I guess, what
8 was left of the trucks, to try determine if there
9 were any code or spec violations prior to the
10 wreck. Was that done?
11    A.   No, sir. It was destroyed. There was
12 no way to do a commercial vehicle inspection.
13    Q.   It would have been useless --
14    A.   Yes, sir.
15    Q.   -- to even try?
16    A.   (Nods head.) And it would have been
17 enclosed in this traffic homicide report too.
18    Q.   Okay. You would have included that in
19 your report if that had been done?
20    A.   Yes.
21    Q.   All right. Have all ten years with the
22 troopers been in the Wiregrass?
23    A.   Yes, sir.

**Page 21**

1    Q.   All out of the Dothan Post, or whatever
2 it's referred to?
3    A.   Yes, sir.
4    Q.   And I assume from that, that you live in
5 this area --
6    A.   Yes, sir.
7    Q.   -- general area? Very familiar with
8 this stretch of U.S. 231?
9    A.   Yes.
10    Q.   Up and down it all the time?
11    A.   I'm not assigned to Pike County, but a
12 year previous, I had worked another traffic
13 homicide in the same location.
14    Q.   Plus, you live around here. You're on
15 231 occasionally, aren't you?
16    A.   Yes, sir.
17    Q.   Did you grow up around here?
18    A.   Yes, sir.
19    Q.   Which county did you grow up in?
20    A.   Houston.
21    Q.   Houston? Let me show you two pictures,
22 Trooper, each of which show kind of a burn spot
23 essentially in the middle of the photographs, and

22

1  ask you -- it appears to me that one of them has
2  photo 37 on the back, and the other one has photo
3  36. It appears that photo 37 is facing southbound
4  on 231, and it shows the Pinckards convenience
5  store -- what I think is Pinckards -- and the burn
6  spot. Is that where at least part of this wreck
7  kind of came to a rest?
8     A.  Yes, sir.
9     Q.  All right. And then this one, which
10 is -- I guess I'll mark as Plaintiff's 2 to your
11 deposition, and I'll mark that one as Plaintiff's 1
12 that we just spoke about -- appears to be looking
13 northward on 231 with -- and you tell me if this is
14 correct. Pinckards would be off to the left-hand
15 side, just not shown in that photograph?
16    A.  Yes.
17    Q.  And, again, the burn spot being where
18 one or more -- both of these trucks came to a rest?
19    A.  Yes.
20    Q.  And do those photographs, Trooper,
21 accurately reflect, to the best of your memory, the
22 scene or the location where this wreck occurred
23 back in March of '05?

23

1     A.  Yes.
2     Q.  In fact, on the back, I think it appears
3  they were taken or shown to have been taken in
4  April of '05; right?
5     A.  Yes.
6     Q.  I'm not sure what I said a minute ago,
7  but now the one that says photo 37 and is
8  southbound is going to be Plaintiff's 2. And the
9  northbound picture is Plaintiff's 1.
10
11       (Whereupon, Plaintiff's Exhibit 1 was
12       marked for identification and same is
13       attached hereto.)
14
15       (Whereupon, Plaintiff's Exhibit 2 was
16       marked for identification and same is
17       attached hereto.)
18
19    Q.  I think that's all I have right now,
20 Trooper. Thank you.
21
22              EXAMINATION
23 BY MR. WHITT:

24

1     Q.  Trooper, my name is Murry Whitt. I
2  represent Michael Adkins in this case. What time
3  was it when you arrived at the scene?
4     A.  8:26 p.m.
5     Q.  So a little over an hour after the
6  accident actually occurred?
7
8       MS. HAMMETT: Object to the form.
9
10    A.  Yes.
11    Q.  And you said Ms. Champion's vehicle was
12 still at the scene?
13    A.  Yes.
14    Q.  Where was that vehicle parked?
15    A.  It was parked in the -- on the
16 southbound shoulder facing south.
17    Q.  Now, that's before you get to Pinckards,
18 if you're going south?
19    A.  Yes. It's going to be north of
20 Pinckards.
21    Q.  Okay. There is a turn lane into the
22 Pinckards. It goes a few feet back up from the
23 Pinckards. Was the vehicle in that turn lane, or

25

1  was it off on the shoulder?
2     A.  I knew it was off the road. I can't
3  recall if it was the turn lane or the shoulder. I
4  know it was off the road at the time.
5     Q.  And did you come from the north or the
6  south when you came to the accident scene?
7     A.  I came from the north.
8     Q.  Do you recall if the headlights or
9  taillights or brake lights were lit on that vehicle
10 as you approached the scene?
11    A.  No, sir.
12    Q.  And was Christy Champion still at the
13 scene when you arrived?
14    A.  No, sir.
15    Q.  Do you know where she had been taken?
16    A.  She had been taken to Edge Regional
17 Medical Center.
18    Q.  And that was to give a blood and urine
19 test?
20    A.  Yes, sir.
21    Q.  I didn't see the results of that test in
22 this report. Do you normally receive those
23 results, or do you have any idea what the results

**26**

1  of those tests were?
2  A.  I normally receive them, but due to the
3  backlog at Mobile, I have yet to receive them.
4  Q.  Okay.  But those were sent to the
5  forensic laboratory for testing?
6  A.  Yes, sir.
7  Q.  Also, I want you to refer yourself to
8  the drawing -- the computerized drawing of the
9  accident scene.  Did you prepare this drawing?
10 A.  Yes, sir.
11 Q.  And this is a computerized drawing
12 showing an impact between the truck driven by
13 Mr. Duke and the motorcycle owned by Mr. Adkins; is
14 that correct?
15 A.  That's correct.
16 Q.  And your drawing shows that impact in
17 the left-hand southbound lane?
18 A.  Yes.
19 Q.  Do you know -- what did you base your
20 conclusions on when you placed that motorcycle in
21 the left-hand southbound lane?
22 A.  By the statement that Mr. Richardson
23 gave me.

**27**

1  Q.  From Mr. Richardson?
2  A.  Yes.
3  Q.  And this was a statement provided to you
4  the day after the accident?
5  A.  Three days after, on the 8th of March,
6  2005.
7  Q.  Okay.  Do you know where Mr. Richardson
8  was when he saw the motorcycle and the truck hit
9  the motorcycle?
10
11         MS. HAMMETT:  Object to the form.
12
13 A.  What he told me was he passed the
14 motorcycle on the road, 231.  I was in the right
15 lane southbound and just missed hitting the
16 motorcycle.  It was very dark, and I only saw the
17 motorcycle ten feet before I got to it.
18 Q.  You didn't talk to anybody who saw the
19 collision between Mr. Adkins and Ms. Champion
20 throughout the course of your investigation; is
21 that correct?
22 A.  The only one I talked to that knew
23 anything about it was Mr. Richardson, and from the

**28**

1  way this is stated right now, he seen it happen in
2  the rearview mirror.
3  Q.  But I'm talking about the collision
4  between Mr. Adkins and Ms. Champion, the motorcycle
5  and car collision.
6  A.  It says right here he looked in his
7  rearview mirror about a hundred yards.  There was
8  no way for him to miss the motorcycle when he hit
9  it.  So, obviously, Mr. Richardson seen it through
10 his rearview mirror between Mr. Adkins and -- no.
11 Excuse me.  I'm sorry.  Mr. Adkins -- I'm sorry.
12 You're right.  No.  I've got so much going on.  I
13 apologize for that.
14 Q.  I would have stopped you, but I felt I
15 needed to let you go ahead and finish.
16 A.  I'm sorry.
17 Q.  And you never talked to Ms. Champion or
18 Mr. Adkins?
19 A.  No.
20 Q.  Do you know who moved Ms. Champion's
21 vehicle from the scene?
22 A.  I know someone came back later that
23 night and got it.  I do not know who.

**29**

1  Q.  And you said the motorcycle was not at
2  the scene when you arrived?
3  A.  It had just been taken from the scene.
4  Q.  Okay.  Did you ever see that motorcycle?
5  A.  No, sir.
6  Q.  Are you familiar with County Road 5532,
7  that is just north of the Pinckards gas station?
8  A.  Yes, sir.
9  Q.  And that road -- there's been testimony
10 earlier that Ms. Champion was -- entered Highway
11 231 from County Road 5532.  That road is about .2
12 miles from the Pinckards gas station; is that
13 correct?
14 A.  Yes.
15 Q.  Did you ever make an effort to contact
16 Ronnie Perkins, who was listed as a witness to the
17 first accident?
18 A.  No, sir.
19 Q.  In your precrash investigation -- let me
20 just go ahead and read part of what you have in
21 there.  You say that Mr. Adkins was unable to avoid
22 the sudden improper lane change that Ms. Champion
23 had just made and struck the rear of her vehicle.

**Page 30**

1  Champion stated that after the collision, she
2  pulled her vehicle off to the shoulder of the road
3  and exited her vehicle to render assistance to
4  Mr. Adkins. She got Mr. Adkins out of the roadway
5  and was leading him over to her car when a
6  commercial vehicle topped the hill. That
7  commercial vehicle was driven by Michael Duke, who
8  was unable to avoid the motorcycle in the roadway.
9      That information, as far as the information
10 related to Champion's actions before and after the
11 accident, came from Officer Helms?
12     A.   That's correct.
13
14          MR. SPARROW:  Objection.
15
16     Q.   Did you have any evidence, testimony, or
17 any result of your investigation that can tell you
18 how long a period of time passed between the
19 accident between Mr. Adkins and Ms. Champion and
20 the collision of Mr. Duke's vehicle with
21 Mr. Adkins' motorcycle?
22
23          MS. HAMMETT:  Object to the form.

**Page 31**

1     A.   No, sir.
2
3          MR. WHITT:  That's all I have.
4          MR. FREEMAN:  I just have a few
5     questions.
6
7               EXAMINATION
8  BY MR. FREEMAN:
9     Q.   What Murry was just talking about in
10 some of this language in the precrash portion of
11 this report -- any information that's contained in
12 the precrash dealing with Adkins and Champion would
13 have been based solely on what Trooper Helms told
14 you?
15    A.   That's correct.
16
17         MS. HAMMETT:  Object to the form.
18
19    Q.   Okay. And you stated earlier you didn't
20 talk with Ms. Champion or Mr. Adkins about how that
21 initial accident actually occurred; is that
22 correct?
23    A.   Yes.

**Page 32**

1     Q.   One thing -- I know if I don't clear it
2  up, then Callen will. The question about whether
3  the taillights were burning on the Champion
4  vehicle, you don't know one way or the other if
5  they were on, do you?
6     A.   No. That was a separate accident,
7  totally investigated by Trooper Helms. I did not
8  have anything to do with that investigation. My
9  sole purpose was the commercial vehicle -- traffic
10 homicide investigation. That that's the only two
11 vehicles that all my attention was focused on out
12 there.
13    Q.   Right. Okay. So any sort of opinion or
14 notation in here -- in your report that you
15 generated about the Champion/Adkins -- that's the
16 car/motorcycle accident -- that would be based on
17 what you were told by people other than those
18 actually involved in the accident; correct?
19    A.   Yes.
20
21         MS. HAMMETT:  Object to the form.
22
23    Q.   Or involved in the accident

**Page 33**

1  investigation; correct?
2
3          MS. HAMMETT:  Same objection.
4
5     A.   That's correct.
6     Q.   Okay. And this raw data in the back of
7  this report, is that from a theodolite or from the
8  measurements taken --
9     A.   Yes, it is.
10    Q.   -- at the scene? And that raw data --
11 what measurements were actually taken?
12    A.   As far as --
13    Q.   Were they taken for distances between --
14 you know, from the initial impact between the truck
15 and the motorcycle to the collision between the two
16 tractor-trailer units?
17
18         MR. SPARROW:  You're talking about
19    this?  (Indicating.)
20         MR. FREEMAN:  Yeah. All that raw
21    data.
22
23    Q.   What is that?

**Page 34**

```
 1    A.   That is the complete scene.  This has
 2  nothing to do with the motorcycle -- the motorcycle
 3  or the car.  It's between the two vehicles -- the
 4  two commercial vehicles.
 5    Q.   Okay.  That's what I was trying to
 6  figure out.  That's all I've got.  Thank you.
 7
 8         MS. HAMMETT:  Randolph, do you
 9      have anything?
10         MR. GILLUM:  No.
11         MS. HAMMETT:  Okay.  I have a few.
12
13              EXAMINATION
14  BY MS. HAMMETT:
15    Q.   I'm going to show you a collection of
16  photos that I'll mark as Defendant's Exhibit 3.
17  It's eight photos.
18
19         (Whereupon, Defendant's Exhibit 3 was
20          marked for identification and same is
21          attached hereto.)
22
23    Q.   Have you ever seen these photos before?
```

**Page 35**

```
 1    A.   Yes.
 2    Q.   Did you take those photos?
 3    A.   Yes.
 4    Q.   And did you take these photos as part of
 5  your investigation?
 6    A.   Yes.
 7    Q.   The photos here the plaintiff has marked
 8  as 1 and 2, did you take those photos?
 9    A.   No.
10    Q.   Had you ever seen those photos before
11  today?
12    A.   No.
13    Q.   When you arrived on the scene, you did
14  personally observe both commercial vehicles; is
15  that correct?
16    A.   Yes.
17    Q.   And you also observed the Champion
18  vehicle on the side of the road; is that correct?
19    A.   Yes.
20    Q.   Was Mr. Ruhnow or Mr. Duke on the scene
21  at the time you arrived?
22    A.   No.
23    Q.   Do you know where they were?
```

**Page 36**

```
 1    A.   They had been transported.
 2    Q.   To a hospital?
 3    A.   Yes, to the hospital.
 4    Q.   I saw a reference in here to a grand
 5  jury.  Do you normally make recommendations to
 6  grand juries as a result of your investigation?
 7    A.   Yes.
 8    Q.   Did you do so in this case?
 9    A.   Yes.
10    Q.   And what was your recommendation?
11    A.   Based on these findings, it is the
12  recommendation of this investigator that the facts
13  of this case be presented to the next session of
14  the Pike County Grand Jury.
15    Q.   And what facts were those?
16    A.   Everything I have stated in this report.
17    Q.   And maybe this is just my lack of
18  knowledge.  When those recommendations get made to
19  the grand jury, what typically happens?
20    A.   They get no bill or charges could be
21  brought up.  I mean, that is part of our standard
22  operating procedure, what we're required to put in
23  there just in case.  Everything gets presented to a
```

**Page 37**

```
 1  grand jury.  So there can be no bill, or they find
 2  something to try it on.
 3    Q.   Do you know what happened in this case?
 4    A.   No, I do not.  They've put it off
 5  several times.  I know it's been coming up, and
 6  they've continued it and continued it and continued
 7  it.
 8    Q.   Do you know who would make presentation
 9  of that information to the grand jury?
10    A.   The Pike County DA.
11
12         MS. HAMMETT:  I think that's all
13      I've got.
14         THE WITNESS:  I want to say one
15      thing -- state one thing.  There's only
16      eight pictures because my camera
17      malfunctioned that night.  There's
18      usually a lot more than that.  And that
19      was one of the reasons that WSFA videoed
20      the scene also.
21
22              EXAMINATION
23  BY MR. SPARROW:
```