# EXHIBIT "D"

```
 1              IN THE UNITED STATES DISTRICT COURT
 2             FOR THE MIDDLE DISTRICT OF ALABAMA
 3                       NORTHERN DIVISION
 4
 5
 6
 7   GERALD RUHNOW and CONNIE      )
 8   RUHNOW,                       )
 9         Plaintiffs,             )
10   vs.                           )   CIVIL ACTION NO.:
11   LANE HEARD TRUCKING, LLC,     )   2:05 CV 527-F
12   et al.,                       )
13         Defendant.              )
14
15
16
17        The deposition of JIMMY HELMS taken
18   pursuant to the Alabama Rules of Civil Procedure
19   before Tina L. Harrison, Court Reporter and Notary
20   Public, State at Large, at Court Reporting
21   Associates, Inc., 256 Honeysuckle Road, Suite 23,
22   Dothan, Alabama, on the 22nd day of January, 2007,
23   commencing at approximately 11:02 a.m.
```

**CONDENSED**

## Page 2

APPEARANCES

FOR THE PLAINTIFFS:
(Gerald Ruhnow and Connie Ruhnow)
   Mr. Callen J. Sparrow, Attorney at Law
   2224 1st Avenue North
   Birmingham, Alabama 35203


FOR THE PLAINTIFF/INTERVENOR:
(Northland Insurance Company)
*(Present via speakerphone)*
   Mr. Randolph J. Gillum, Attorney at Law
   Rogers & Associates
   3000 Riverchase Galleria, Suite 650
   Birmingham, Alabama 35244


FOR THE DEFENDANT:  (Lane Heard Trucking, LLC)
   Ms. Katie L. Hammett, Attorney at Law
   Hand Arendall, LLC
   107 St. Francis Street, Suite 3000
   Mobile, Alabama 36601

## Page 3

APPEARANCES (Continued)

FOR THE DEFENDANT:  (Christy Leann Champion)
   Mr. Richard McConnell (Mac) Freeman, Jr.,
     Attorney at Law
   Rushton, Stakely, Johnston & Garrett, PC
   184 Commerce Street
   Montgomery, Alabama 36101


FOR THE DEFENDANT:  (Michael Adkins)
   Mr. Murry S. Whitt, Attorney at Law
   Nix Holtsford Gilliland Higgins & Hitson, PC
   4001 Carmichael Road
   Montgomery, Alabama 36103-4128

## Page 4

STIPULATION

IT IS STIPULATED by and between Counsel for the parties that this deposition be taken at this time by Tina L. Harrison, Court Reporter and Notary Public, State at Large, who is to act as commissioner without formal issuance of commission to her; that said deposition be taken down stenographically, transcribed and certified by the commissioner.

Except for objections as to the form of the questions, no objections need be made at the time of the taking of the deposition by either party, but objections may be interposed by either party at the time the deposition is read into evidence, which shall be ruled upon by the Court on the trial of the cause upon the grounds of objection, then and there assigned.

The reading and signing of the deposition is waived.

## Page 5

INDEX

| EXAMINATION BY: | PAGE NO. |
|---|---|
| Ms. Hammett | 6 - 14 |
| Mr. Sparrow | 14 - 20 |
| Mr. Whitt | 21 - 33 |
| Mr. Freeman | 33 - 39 |
| Ms. Hammett | 39 - 41 |
| Mr. Sparrow | 41 - 42 |
| Mr. Whitt | 42 |

EXHIBITS

| DEFENDANT'S | | PAGE NO. |
|---|---|---|
| 1 | Alabama Uniform Traffic Accident Report | 9 |

Page 6

JIMMY HELMS,
being first duly sworn to tell the truth testified
as follows:

EXAMINATION

BY MS. HAMMETT:

Q. Hi, Corporal Helms. I'm Katie Hammett. I represent Lane Heard Trucking in this action that's being brought by Gerald Ruhnow, Connie Ruhnow, and Northland Insurance Company. Can you state your full name for the record?

A. My name is Trooper Corporal Jimmy Helms.

Q. And where do you work, Mr. Helms?

A. I work with the Alabama Department of Public Safety, Dothan Post.

Q. And I understand that you're a corporal. Can you explain the difference to me?

A. Yes, ma'am. At this present time, I'm the supervisor -- first line supervisor for field troopers that work in the field.

Q. How long have you been with the troopers?

A. For ten years.

Page 7

Q. As a regular part of your duties as an Alabama state trooper, do you investigate traffic accidents?

A. Yes.

Q. How many traffic accidents do you think you've investigated over the years?

A. I've been in law enforcement for 17 years. Probably close to a thousand, I would say.

Q. So you were in law enforcement before you became a state trooper?

A. Yes, I was.

Q. And what area were you in then?

A. I worked with the Montgomery Police Department, City of Montgomery.

Q. Did you come to investigate an accident that happened on March 7th, 2005, on Highway 231 near Troy, Alabama?

A. Yes. I assisted with an accident that occurred there at that location.

Q. Can you tell me what you remember about that accident?

A. Yes, ma'am. I remember receiving a call about an accident. The details are very sketchy.

Page 8

Initially, all we knew was that there were multiple injuries with a large fire. And at the time I responded from Troy, arrived on the scene, I found that all four lanes of U.S. Highway 231 were blocked due to an accident.

Apparently, two commercial vehicles had collided head-on in the northbound lanes. And at the time that I initially responded, we were doing the best we could to locate persons that were injured and insure they receive medical treatment and doing the best we could to secure the scene and get other units en route to assist with the accident.

Q. How many vehicles were involved in the accident?

A. The two commercial vehicles collided; and, also, there was an incident preceding these two commercial vehicles that actually contributed to the accident itself occurring, which was, I believe, a passenger vehicle. I believe it was a Grand Prix and a motorcycle that actually had an accident, causing the motorcycle to be laid down in the roadway, which the southbound commercial

Page 9

vehicle had struck while it was in the roadway, I believe, disabling the vehicle, causing it to veer over into the northbound lane and collide with the northbound tractor-trailer.

Q. I'm going to show what I'm going to mark as Defendant's Exhibit 1.

(Whereupon, Defendant's Exhibit 1 was marked for identification and same is attached hereto.)

Q. It's a three-page accident report, and I believe it indicates that you were the investigating officer; is that correct?

A. Yes, ma'am, this is correct.

Q. As I understand it -- and correct me if I'm wrong -- you came to investigate the collision that happened between Christy Champion and Michael Adkins, and another trooper came to investigate the collision between the two tractor-trailers; is that --

A. That is correct. Of course, at the time we initially responded, we did not realize that

**Page 10**

that was the circumstances. But that's how we wound up working these two incidents.

Q. Did you do any investigation of the collision that took place between the two tractor-trailers?

A. No, ma'am. The only thing I did as far as the two tractor-trailers were concerned was I assisted with one of the -- the occupants in one of the tractor-trailers. It was actually in the ditch on the northbound side of the roadway.

I assisted emergency personnel in getting that individual into an ambulance, and then I just helped secure the overall scene because it was all -- even though we worked two separate reports on these incidents, it was all, as we were looking at it, kind of one incident. So we secured the entire area and I assisted with that, securing the area surrounding --

Q. Do you know who it was that you assisted from the ditch and got into the ambulance?

A. No, ma'am. I never knew his name.

Q. Do you know whether or not he died or lived?

**Page 11**

A. I don't know.

Q. After you had secured the area, what did you proceed to do?

A. We made sure that we got some more units en route to assist with securing the scene, and I called to make sure we had a traffic homicide investigator en route. We asked surrounding agencies to assist with detouring traffic from the northbound and southbound sides of 231 around the scene and coordinated with the -- made sure we had PIO en route to assist with the media that was arriving. And that's basically all.

Q. Did you say PINO (sic)?

A. Yes, ma'am.

Q. What is that?

A. Public information officer.

Q. And who was that that worked this accident, if you know?

A. I believe it was Tracy Nelson.

Q. And you said that you called to make sure that there was a traffic homicide investigator --

A. Yes, ma'am.

**Page 12**

Q. -- en route? And did a traffic homicide investigator come to the scene?

A. Yes, he did.

Q. And who was that?

A. Trooper Kevin Cook.

Q. And is that some sort of specialty?

A. Yes, ma'am, it is.

Q. And I know we've got Trooper Cook, but do you know -- is that a special course? Is that a --

A. Yes, ma'am. They receive advanced training in investigating motor vehicle accidents with maybe loss of life.

Q. And other than this accident report, do you have any other notes or information on your investigation?

A. No, ma'am. This is all that I have, just this accident report.

Q. And at what point did your involvement end with the investigation of this accident?

A. At what point was my involvement?

Q. Did you assist Trooper Cook later on? Was it just that evening?

**Page 13**

A. It was just that evening at the scene. I didn't give him any other assistance regarding the investigation. Primarily, my responsibility once I got there was just to secure everything, make sure that nothing was tampered with, removed until he arrived on the scene.

Q. And was that the case?

A. Yes, ma'am, that was the case. Also, we notified a Motor Carrier Safety officer to come to inspect the accident, and I believe Sergeant Ken Kelley was the one that was there on the scene for that. Anytime we have a motor vehicle accident involving serious injury or death, we have a Motor Carrier Safety officer respond to do inspections on the vehicles and what have you.

Q. And what are those inspections meant to do?

A. Well, they just check to see that these commercial vehicles were up to code or meeting specs required in the Motor Carrier Safety code.

Q. Do you know what the results of that investigation were?

A. No, ma'am. I wouldn't say it's an

**Page 14**

1 investigation. It was termed an inspection.
2   Q.  And that was Officer Ken Kelley?
3   A.  Sergeant Ken Kelley. Yes, ma'am.
4   Q.  Sergeant? Okay.
5   A.  Trooper Cook may have more information
6 regarding that inspection.
7   Q.  I believe that you may have taken some
8 sort of blood or urine sample from Christy
9 Champion. Do you recall that?
10  A.  I do not recall.
11
12      MS. HAMMETT: I think that's all
13  I've got.
14
15          EXAMINATION
16 BY MR. SPARROW:
17  Q.  Trooper, I have just a couple of
18 questions for you.
19  A.  Yes, sir.
20  Q.  When you were first alerted to something
21 going on out at 231 out there, on your way there,
22 did you know about the two-commercial vehicle wreck
23 or just the motorcycle/car wreck?

**Page 15**

1   A.  Well, we didn't know anything at the
2 time. The only report that I received was that
3 there was a major accident on U.S. Highway 231 with
4 a large fire, and it was not until I arrived on the
5 scene that I determined what had happened.
6   Q.  When you got there, was the fire still
7 burning or had it kind of burned itself out?
8   A.  No, sir. It was heavily involved when
9 we arrived on the scene.
10  Q.  You didn't see either of the two wrecks,
11 did you?
12  A.  No, sir, I did not.
13  Q.  And any information you had or have
14 about that was from people that you talked to?
15  A.  That's correct.
16  Q.  And can you tell us the names of anybody
17 that you talked to? Your report lists Ronnie
18 Perkins and Randall Jackson on the report involving
19 the Champion and Adkins' vehicles. Would those be
20 the only two witnesses that you --
21  A.  Yes, sir. Those would be the only two
22 individuals. If I had spoken with anyone else, I
23 would have included them on an additional witness

**Page 16**

1 sheet, which I don't have here. So those were the
2 only two individuals that I've spoken with
3 regarding the accident.
4   Q.  And I think somebody asked you this a
5 minute ago. If you had any field notes, you don't
6 have them anymore?
7   A.  I didn't have any field notes whatsoever
8 regarding this --
9   Q.  Just the report --
10  A.  Yes, sir.
11  Q.  -- that you did but didn't have a
12 separate notebook or a separate --
13  A.  No, sir. This is what I did right
14 here. (Indicating.)
15  Q.  Okay. When you pulled up to the -- I'm
16 fairly familiar with where this happened. It's
17 north of what we would call the Pinckards 7-Eleven
18 or --
19  A.  That's right.
20  Q.  -- convenience store.
21  A.  Uh-huh.
22  Q.  Where were you when you got the call?
23 Which direction were you coming from?

**Page 17**

1   A.  I was in the city of Troy.
2   Q.  All right. So you were coming south?
3   A.  Yes, sir. I was traveling southbound on
4 U.S. 231 when I arrived on the scene.
5   Q.  Were you by yourself, or did you have
6 another trooper or police officer in the car with
7 you?
8   A.  No, sir. I was by myself.
9   Q.  Do you live -- I'm assuming, since you
10 work out of the Dothan Post, that you live
11 somewhere in this area?
12  A.  No, sir. I live in Troy.
13  Q.  All right. So you're driving back and
14 forth between Troy and Dothan, either for personal
15 business or in your job, just --
16  A.  Yes, sir.
17  Q.  -- all the time?
18  A.  Uh-huh.
19  Q.  Very familiar with 231?
20  A.  Yes, sir.
21  Q.  You know how if you're coming from Troy
22 towards where this wreck happened, some distance
23 back down the highway there's a little hillcrest?

**18**

1  A. Yes, sir.
2  Q. And you really can't see anything down
3  there until you get to the hillcrest?
4
5  MS. HAMMETT: Object to the form.
6
7  Q. Correct? There's a point at which you
8  can't see Pinckards or part of the highway down
9  there until you get up over that little hill?
10
11  MS. HAMMETT: Same objection.
12
13  A. Right. That's -- well, there is a
14  hillcrest at the next intersection north from where
15  the accident occurred. It declines somewhat and
16  it's -- and you can't see until you get -- there,
17  at the county road that turns to the right, you
18  have a more clear view of --
19  Q. The area where this wreck happened?
20  A. Yes.
21  Q. And from that hillcrest to where this
22  wreck occurred is a straight stretch of highway?
23  A. Yes, sir, it is.

**19**

1  Q. As you approached that night after
2  receiving the call, did you have any difficulty
3  seeing the cars that we now know as Ms. Champion's
4  car and the other vehicles that were parked down
5  towards where that wreck occurred?
6  A. Well, at the time I pulled up there, it
7  was difficult to see anything because it was dark
8  and the fire was so involved. It was completely
9  masking everything else in the area except for the
10  emergency lights that were already there from the
11  ambulance. So it was difficult for me to see
12  anything because the fire was so involved.
13  Q. So could you actually see the glow of
14  that fire even before --
15  A. Oh, yes, sir. It was --
16  Q. -- you crested that hill?
17  A. Yes, sir. You could see the fire some
18  distance back before you actually arrived.
19  Q. Make sure I'm clear. Other than Randall
20  Jackson, who is listed on the report, and Ronnie
21  Perkins, who you mentioned a second ago, would it
22  be fair to say that you didn't discuss with
23  anybody --

**20**

1  A. No, sir.
2  Q. -- what happened in this initial wreck,
3  other than perhaps, of course, Mr. Adkins and
4  Ms. Champion?
5  A. Right.
6  Q. You did speak to them?
7  A. We spoke with them regarding the
8  accident that they were involved in.
9  Q. And then Mr. Jackson and Perkins. And
10  other than that, you would have made a note
11  somewhere if there had been any other witnesses
12  that you were aware of?
13  A. That's correct.
14  Q. Did you at any point in this
15  investigation, Trooper Helms, speak with either a
16  Gene Richardson -- or with Mr. Gene Richardson, who
17  is listed on the wreck report for the two
18  commercial vehicles?
19  A. No, sir. I don't recall speaking with a
20  Mr. Gene Richardson at all.
21  Q. I think that's all I have. Thank you,
22  Trooper.
23

**21**

1  EXAMINATION
2  BY MR. WHITT:
3  Q. Trooper Helms, my name is Murry Whitt,
4  and I represent Mr. Adkins in this case. When you
5  arrived at the scene, where was Christy Champion's
6  car parked?
7  A. It was just off the road. If I recall
8  correctly, I believe it was just off the roadway,
9  just on the right side.
10  Q. Was that before you get to Pinckards?
11  A. Yes, sir.
12  Q. And isn't there a turn lane that goes
13  into Pinckards, an auxiliary lane as you approach
14  Pinckards?
15  A. I don't recall a turn -- I don't believe
16  there's a turn lane there. I would have to go
17  back -- I believe there is, that goes to the right,
18  right there as you're coming into Pinckards
19  grocery. Yes, sir. I've got it listed here.
20  There is a turn lane there just on the right.
21  Q. And is that where her vehicle was
22  parked? In that turn lane?
23  A. Yes, sir. It was just off the roadway

## Page 34

1  A. Yes, sir.
2  Q. Okay. And what other officers were at
3  the scene besides you and Trooper Cook?
4  A. Sergeant Ken Kelley was also present.
5  Q. What did you do to assist Trooper Cook
6  in the investigation -- the homicide investigation?
7  A. I didn't do anything as far as the
8  homicide investigation is concerned. I was just
9  there to secure the scene, to make sure we didn't
10 have people wandering around in the scene touching
11 anything, other than the emergency personnel that
12 were there working, trying to save persons' lives
13 that were -- and the firefighters were there trying
14 to put out the fire.
15    Once Trooper Cook got there, he began working
16 on homicide and that's when I began doing the
17 report between Ms. Champion and Mr. Adkins, once we
18 were able to determine this was two separate
19 incidents, but the first one contributing to the
20 other.
21 Q. Did you ever get any idea from any of
22 the witnesses that you spoke with or any of the
23 drivers as to the amount of time that went by from

## Page 35

1  the initial collision between Adkins and Champion
2  and when the truck hit the motorcycle?
3
4       MS. HAMMETT: Object to the form.
5
6  A. I don't remember either of them making a
7  statement as to apparently how much time had
8  transpired, but it appeared it was just a very
9  short time after the first incident occurred, from
10 the investigation.
11 Q. This has already been covered somewhat.
12 You talked with Ms. Champion, Mr. Adkins --
13 A. Right.
14 Q. -- Mr. Jackson --
15 A. And Mr. Perkins.
16 Q. -- and Mr. Perkins. Did you obtain any
17 written statements from any of these individuals?
18 A. No, sir, I did not. I just basically
19 asked them what they observed regarding this
20 particular accident.
21 Q. Okay. And your testimony today -- is
22 your recollection based on something you recall
23 independently, or is it based on what you generated

## Page 36

1  in this report?
2  A. My recollection, as far as the incident
3  is concerned, is basically what I've got here on
4  this report. I remember the accident, but as far
5  as exact details about time, who exactly said what,
6  you know, I can't -- I can't say for sure.
7  Q. Did either Mr. Jackson or Mr. Perkins,
8  or both, tell you that they saw the incident take
9  place between Ms. Champion and Mr. Adkins?
10 A. Yes.
11 Q. Okay. And you're basing part of your
12 conclusions on what they told you, either Perkins
13 or Jackson?
14
15       MS. HAMMETT: Object to the form.
16
17 A. That's not always the case. I don't
18 always -- we take the witnesses' statements,
19 basically, but we don't use that as a determining
20 factor to determine what actually caused an
21 accident. We try to look at the scene. The
22 circumstances that exist on the scene determine
23 actually what happened, hopefully.

## Page 37

1  Q. Did you have an opportunity to take any
2  sort of measurements, I guess, relative to the
3  Champion/Adkins collision? I mean, there was no
4  fatality involved in that particular collision --
5  A. No. I did not take any measurements
6  relative to this particular accident.
7  Q. And any measurements that might have
8  been taken were done in the homicide
9  investigation --
10 A. That's correct.
11 Q. -- by Trooper Cook?
12 A. That's correct.
13 Q. Is your understanding of what Mr. Adkins
14 told you simply that he was traveling in the inside
15 or left southbound lane, and then Ms. Champion
16 entered that lane? Then he got in the other one,
17 and she got in the right lane as well?
18 A. Right.
19 Q. There's been testimony by Mr. Adkins
20 that both he and Ms. Champion were in the same
21 lane, in the right-hand lane, for about five
22 seconds before the collision occurred. Did he tell
23 you that that night?

**Page 38**

1  A. I don't recall him giving me a specific
2  time frame in which he was behind Ms. Champion
3  before he collided with her.
4  Q. Okay. Did he tell you how fast he was
5  driving?
6  A. Yes. I believe I did ask him
7  approximately what his speed was. He stated to me
8  he was doing 50 miles per hour.
9  Q. Now, 50 miles per hour, is that the
10 speed that you would record as being a premaneuver
11 speed, or is that impact speed?
12 A. That would have been about -- a
13 premaneuver speed, I would say. Of course, he was
14 braking before he actually collided with the
15 vehicle, and I'm not sure how fast he might have
16 been going before he actually collided with her.
17 Q. Your role in the homicide investigation
18 was what?
19 A. I didn't have any role in the homicide
20 investigation.
21 Q. Not at all? You didn't help with any
22 photos?
23 A. No, sir.

**Page 39**

1  Q. Do you know of anything that would have
2  been obstructing the view of the motorcycle for
3  traffic driving southbound, such as the 18-wheeler?
4
5      MS. HAMMETT: Object to the form.
6
7  A. No, sir. I don't know of anything that
8  would have been there to obstruct the view at the
9  time. I didn't indicate anything was obstructing
10 his view at the time of the accident.
11 Q. I believe that's all I have. Thank you.
12
13      MS. HAMMETT: Randolph, do you
14   have anything?
15      MR. GILLUM: No.
16      MS. HAMMETT: I have just a
17   couple, just to be sure.
18
19              EXAMINATION
20 BY MS. HAMMETT:
1  Q. You didn't take any photos of this
22 accident?
23 A. No, ma'am, I didn't.

**Page 40**

1  Q. You didn't take any video of this
2  accident?
3  A. No, ma'am, I didn't.
4  Q. Did you observe Ms. Adkins' vehicle
5  after the accident?
6  A. Ms. Champion?
7  Q. I mean Ms. Champion. I'm sorry.
8  A. Yes, ma'am. I did see her vehicle.
9  Q. Do you recall what damage it sustained?
10 A. It was just very minor damage to the
11 rear end where the motorcycle impacted it.
12 Q. Do you recall whether or not her
13 taillights were busted out?
14 A. I can't recall. I don't recall if her
15 light was busted out or not.
16 Q. Did you observe Mr. Adkins' motorcycle
17 after the accident?
18 A. Yes, ma'am.
19 Q. What did it look like?
20 A. Well, it was in pieces. It had been
21 drug for some distance under the other vehicle --
22 under the commercial vehicle, I believe. But it
23 was torn up pretty good.

**Page 41**

1  Q. Would there be any way for you to
2  determine what damage was done to that motorcycle
3  as a result of the incident with Ms. Champion
4  versus being drug under the --
5  A. I wouldn't be able to determine --
6  Q. -- tractor-trailer?
7  A. I wouldn't have the ability to do that.
8
9      MS. HAMMETT: That's all I have.
10
11              EXAMINATION
12 BY MR. SPARROW:
13 Q. I just have one or two, Trooper.
14 A. Yes, sir.
15 Q. You mentioned in some discussion earlier
16 about whether or not the lights were on
17 Ms. Champion's vehicle when you arrived. You said
18 you didn't recall --
19 A. Right. I didn't.
20 Q. -- headlights or taillights.
21 A. Right.
22 Q. I just want to make sure it's clear that
23 you just don't remember; is that correct?